Luis DE AZCARATE et al., Petitioners,

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,**

**Marvin Pitkin and Walter J. Schafer, Intervenors.**

**No. 12650.**

District of Columbia Court of Appeals.

Argued May 11, 1978.

Decided July 14, 1978.

James L. Montgomery, Washington, D. C., for petitioners. Nelson Deckelbaum, Washington, D. C., was on the brief for petitioners.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., for respondent. Richard W. Barton, Deputy Corp. Counsel, Wash-

ington, D. C., also entered an appearance for respondent. Respondent adopted the brief of the intervenors.

Whayne S. Quin, Washington, D. C., with whom Norman M. Glasgow and Iverson O. Mitchell III, Washington, D. C., were on the brief, for intervenors.

Before KELLY, KERN and YEAGLEY, Associate Judges.

KERN, Associate Judge:

Petitioners seek review of a final order of the District of Columbia Board of Zoning Adjustment (Board) which granted intervenors a variance from the R–1–A district's minimum lot-width requirement of 75 feet, thereby permitting them to construct a single-family residence on the lot in question.

The history of the present dispute can be briefly summarized. Lot 17, for which the Board granted the area variance was originally part of a considerably larger lot designated Lot 13. Lot 13 was a triangular-shaped parcel of approximately 26,000 square feet, located in the R–1–A zone.[1] During July 1975, Lot 13 was subdivided into three lots and this subdivision was duly recorded at the Office of the Surveyor of the District of Columbia. Subsequently, Lot 17 was enlarged slightly to include an additional strip of land and this subdivision was also recorded. Following the approval of the second subdivision, intervenor-Pitkin applied for and *received* a building permit for the construction of a single-family dwelling on Lot 17.[2]

As approved, Lot 17 was an irregular configuration. The main body of the property was connected to the street by a strip of land 30 feet wide and 70 feet long. A single-family home was to be constructed on the main portion of the lot, which contained approximately 8,500 square feet. Intervenor-Pitkin did not proceed with construction of the dwelling and, during December 1976, he sold Lot 17 to intervenor-Schafer on condition that the property was suitable for the erection of a single-family residence. During this same time-frame, single-family homes were constructed upon each of the other two lots carved from the original Lot 13.[3]

When intervenor-Schafer applied for another building permit in February 1977, his application was rejected on the ground that Lot 17 failed to conform with the width requirements of the R–1–A zone; specifically, the Zoning Regulations Division concluded that Lot 17 was substandard since its width measured approximately 62 feet although the R–1–A zone requires a 75-foot width.[4]

---

1. The minimum lot-area requirement for this particular type of zone is 7,500 square feet. D.C. Zoning Regs. § 3301.1. No one disputes that intervenors meet this requirement.

2. Prior to recording a proposed subdivision, the Office of the Zoning Regulations Division reviews the subdivision to determine whether or not it is in accordance with the applicable zoning regulations. Also, D.C. Zoning Reg. 8103.1 provides: ". . . a building permit shall *not* be issued . . . *unless* such structure complies with the provisions of these regulations." (Emphasis added.) Presumably, such reviews occurred on three occasions: first, when Lot 17 was recorded; second, when the addition to Lot 17 was added and recorded; and third, when the first building permit was issued.

3. Petitioners do not allege that the other two lots upon which the houses were built are substandard in any respect.

4. The record does not clearly indicate the basis for the zoning authorities inconsistent decisions—*viz.*, the grant of a building permit followed by the rejection of an application concerning the very same lot. One of the Board's findings of fact indicates that ". . . after [a] *reinterpretation* and application of the definition of width of lot for lot 17, by the Zoning Regulations Division, the applicant was told the lot no longer complied with such definition and that all previous approvals had been in error." (Emphasis added.) Counsel for intervenors, during the hearing before the Board, described the different techniques of computation which purportedly produced the inconsistent results. Regardless of the methodology employed, the record indicates that on April 13, 1976, the Zoning Regulations Division concluded that the average width of Lot 17 was 76 feet. A later computation made when intervenor-Pitkin's application for a building permit was submitted, produced an average lot width figure of 50 feet. This figure was later withdrawn when the Zoning Regulations Division concluded that Lot 17 had an average width of 62 feet. Intervenors raise no specific challenge to the propri-

Following the denial of his application for a building permit, intervenor-Schafer sought to obtain a variance from the 75-foot width requirements of the R-1-A zone.[5] After a public hearing, the Board, by unanimous vote, granted the area variance on the ground intervenors had established a practical difficulty in utilizing the lot. The Board concluded ". . . that [without a variance] the unusual shape of the lot renders it unusable for any purpose." The Board further concluded that relief, by way of a variance, could be granted without ". . . substantial detriment to the public good and without substantially impairing the intent, purpose and integrity of the zone plan."

D.C.Code 1973, § 5-420(3) provides in pertinent part:

Where, by reason of exceptional narrowness, shallowness, or shape of a specific piece of property at the time of the original adoption of the regulations or by reason of exceptional topographical conditions *or other extraordinary or exceptional situation or condition of a specific piece of property*, the strict application of any [zoning] regulation . . . would result in peculiar and exceptional practical difficulties to or exceptional and undue hardship upon the owner of such property, [a variance may be granted]. [Emphasis added.]

Petitioners' first contention is the Board lacked the statutory authority to grant a variance on the ground of any alleged difficulty in the application of the lot-width zoning regulation to Lot 17 since:

"exceptional situation or condition of a specific piece of the property" refers to a

situation or condition connected to the property. It does not include the circumstances here where invalid subdivisions and an invalid permit were issued because those circumstances are not conditions of a specific piece of property. [Petitioner's brief at 5.]

Intervenors respond, *inter alia*, that the grant of authority contained in the statutory phrase "or other extraordinary or exceptional situation or condition of a specific property" permits the Board to grant a variance in this case. We agree with the intervenors that this statutory language serves as a grant of authority to the Board empowering it to provide variance relief, in appropriate cases, to extraordinary or exceptional conditions brought about after the original adoption of the zoning regulations.[6]

This court has recognized the purposes served by a procedure through which a variance can be obtained:

It is designed to provide relief from the strict letter of the regulations, protect zoning legislation from constitutional attack . . . and prevent usable land from remaining idle. [*Palmer v. Board of Zoning Adjustment*, D.C.App., 287 A.2d 535, 541 (1972). *See Daniel v. Board of Zoning Adjustment*, D.C.App., 329 A.2d 773, 775 (1974); *Salsbery v. Board of Zoning Adjustment*, D.C.App., 318 A.2d 894, 896 (1974).]

*Palmer v. Board of Zoning Adjustment, supra* at 539, did observe that "few cases . . . [have construed] the term 'extraordinary or exceptional situation . . . of a specific piece of property'." Moreover, the legislative history of § 5-420

ety of any alleged changes by the Zoning Regulations Division in their interpretation of the term "lot width."

5. A variance of approximately 16% was needed to permit utilization of Lot 17. Intervenors contend, without contradiction, that the property satisfied every other requirement of the R-1-A zone. The record indicates that the complaints of the petitioners to the proposed construction of a single-family home were entirely esthetic.

6. Consideration of all of petitioners' contentions is unnecessary in light of our resolution of

this case. The thrust of petitioners' argument is that the Board lacked authority to grant a variance. Assuming the Board possessed statutory authority to act, petitioners cannot contend persuasively that its factual findings are not supported by and in accordance with reliable, probative and substantial evidence in the whole administrative record or that the Board's conclusions do not flow rationally from these findings. *Ass'n for Preservation of 1700 Block of N Street, N.W. and Vicinity v. BZA*, D.C. App., 384 A.2d 674, 677 (1978).

offers no explanation of the standard. *Id.* In that case, this court did not attempt to define comprehensively the content of the term "extraordinary or exceptional situation or condition"; instead, decisions from other jurisdictions are cited which defined the term to include economic, geographic or topographic conditions or *a condition created by the zoning authority's zoning of a lot* "partly for residence and partly for business." *Id.*[7]

 A second decision of this court suggests that petitioner's claim is not well taken; *viz.*, that a variance can be granted only where the extraordinary or exceptional situation or condition inheres in the land itself at the time of the passage of the statute. In *Clerics of St. Viator, Inc. v. Board of Zoning Adjustment*, D.C.App., 320 A.2d 291, 293–4 (1974), this court rejected the contention that "only a hardship which is inherent in the 'land' can be the basis of a variance." In that case, a *use* variance was sought in order to permit the conversion of an existing religious seminary into a nursing home.[8] *Id.* at 292. After concluding that an exceptional situation had been shown by the applicant, *viz.*, a serious and continuing decline in the seminary's enrollment, the court stated:

> We think that the statute is clear. It provides that "other extraordinary or exceptional situation or condition of a specific piece of property" may be grounds upon which a variance may be granted. The Board is in error when it takes the position that a variance may only be issued when the required hardship inheres in "land" as opposed to "property." [*Id.* at 294.]

In effect, the extraordinary or exceptional condition which is the basis for a use variance need not be inherent in the land, but can be caused by subsequent events extraneous to the land itself, such as the failure of the seminary to remain a viable institution in *Clerics of St. Viator, Inc., supra.*[9]

 We also need not in this case precisely define the contours of the term "extraordinary or exceptional situation or condition." In our view, that term was designed to serve as an additional source of authority enabling the Board to temper the strict application of the zoning regulations in appropriate cases, subject to the limitations found in Section 5–420. It is sufficient for the present to conclude that the facts of this case fall within the ambit of that term. *See Palmer v. Board of Zoning Adjustment, supra* at 542 (the nature and extent of the burden justifying an area variance is best left to the facts and circumstances of each case).

 Consequently, we hold that the Board was authorized to grant an area variance in the instant case due to the extraordinary situation concerning Lot 17 which created "peculiar and exceptional practical difficulties" for the intervenors. However, because it is not necessary to define comprehensively the statutory term at issue here, we will recite those factors which we found significant to the outcome in the instant case. First, the record suggests and it was asserted during oral argument by intervenors, without contravention by peti-

---

7. During oral argument, counsel for petitioners contended that a broad interpretation of the phrase "extraordinary or exceptional situation or condition of a specific piece of property" would vest the Board with unbridled authority. We disagree. D.C.Code 1973, § 5–420(3) itself imposes restraints upon the Board's discretion. Once an extraordinary and exceptional situation or condition has arisen, the owner of the property must show "peculiar and exceptional practical difficulties" or "exceptional and undue hardship." Furthermore, the Board may grant variance relief pursuant to the statute only where there is no "substantial detriment to the public good" and no "[impairment of]

the intent, purpose, and integrity of the zone plan."

8. That an application for a use variance requires a greater burden of proof than for an area variance is well-established in this jurisdiction. *Ass'n for Preservation of 1700 Block of N St., N.W. and Vicinity v. BZA, supra* at 677; *Palmer v. BZA, supra* at 541.

9. This is not to say that *any* subsequent event will invariably result in unusual conditions supporting the grant of a variance, particularly if an affirmative act of the applicant is the direct and sole cause of the hardship complained of.

tioners, that the original Lot 13, although of irregular shape, was susceptible to subdivision into three conforming parcels. Second, zoning office personnel, on three occasions, implicitly found that Lot 17 conformed to the lot width requirements of the R–1–A zone. Third, intervenors proceeded in good faith, following the subdivision of the original parcel and, eventually, two homes were constructed on two of the three newly-created lots. Finally, during oral argument before this court, counsel for the Board conceded that the present dispute was due to the actions of the zoning officials which were later found to be in error.

Petitioner's second contention is that the "self-created hardship rule" bars variance relief where the affirmative act of the applicant, or his predecessor in title, is the sole cause of the hardship complained of.[10] At the outset, petitioner is confronted by *A.L.W., Inc. v. Board of Zoning Adjustment*, D.C.App., 338 A.2d 428, 431–32 (1975), where it is said:

> In New York, for instance, the rule seems to be "that the 'self created hardship' concept does not apply to area variance cases, *i. e.*, the fact that the condition complained of was self created is not dispositive of the matter but only one factor to be considered by the zoning board in determining whether to exercise its discretion and grant an area variance." [*Id.* at 431–32.]

Petitioner seeks to avoid the import of this decision by arguing:

The type of affirmative action creating the [zoning] difficulty as here has to be distinguished from the type of self-created difficulty which arises when the applicant has purchased the lot subject to the zoning ordinance. The latter, the purchase type of self-created difficulty, does not bar relief for an area variance. . . The distinction from the facts before the court in this petition was recognized in *A.L.W., Inc. [v. Board of Zoning Adjustment, supra]*, at 432 when the court said:

> Unless the applicant himself—as a result perhaps of some prior conveyance—is responsible for the irregular shape of the property, he cannot as a practical matter improve the lot in any way that would enable him to realize income or sell it to a purchaser for value. . . .

The act of the applicant or a former owner in the chain of title creating the condition does bar relief. [Petitioner's brief at 11.]

However, a recent decision of this court, *Association for Preservation of 1700 Block of N Street, N.W. and Vicinity v. Board of Zoning Adjustment*, D.C.App., 384 A.2d 674, 678 (1978), undermines petitioners' argument. In that case, the Board granted a parking variance.[11] After concluding that the Board properly treated the application as an area variance rather than as a use variance, the court rejected the petitioners' contention that the rule of self-created hardship applied.[12]

---

**10.** Petitioner cites 2 A. Rathkopt, Law of Zoning § 48–1 (3rd ed. 1972), for the proposition that:

> if the peculiar circumstances . . . have been themselves caused or created by the property owner or his predecessor in title, the essential basis of a variance, *i. e.*, that the hardship be caused *solely* through the manner of operation of the ordinance upon the particular property is lacking. In such a case, a variance will not be granted. [Emphasis in original.]

**11.** The opinion notes that

> Provision of the *required* off-street parking with the proposed building on the subject property is impossible due to its irregular shape; furthermore, even if the lot were rectangular in shape, only thirty parking

spaces—rather than the required forty—could be provided with the building. There would be further hardship to the YMCA if the required parking were to be placed below the proposed swimming pool. Each such parking space would cost over $20,000 to provide, whereas the normal cost of each off-street parking space located within the garage structure is between $6,000 and $8,000. [*Id.* at 676.]

**12.** The problem faced by the applicant (YMCA) in that case was "self created" in the narrow sense that the configuration of the lot, the design of the building, and the zoning regulations in force combined to create the hardship. Although it is clear that given these variables the YMCA could not readily comply with the zoning code on the lot in question, it is equally

Petitioners state that whatever hardship faced the YMCA "was self-created to the extent of Metro YMCA having *full knowledge* of all problems with the alleged shape of the land, the type of zoning, and costs of putting in the parking *prior* to the purchase of the property in March 1974." The YMCA's self-created hardship in not a factor to be considered in an application for an area variance, however, as that factor applies only to a use variance. [*Id.* at 678. *See Salsbery v. Board of Zoning Adjustment*, D.C. App., 357 A.2d 402, 404 (1976); *A.L.W., Inc. v. Board of Zoning Adjustment*, *supra* at 431 (emphasis in original).] [13]

■ Regardless of the impact of *A.L.W., Inc. supra*, and *Association for Preservation of 1700 Block of N Street, N.W., supra*, on the applicability of the self-created hardship rule in area variance cases, we think petitioners' argument founders for yet another reason; *viz.*, the particular facts of this case. The self-created hardship rule is, in fact, a manifestation of the equitable principle of estoppel; that is, where an applicant for an area variance, or his predecessor in title, has committed an *affirmative act* which directly results in the hardship complained of, variance relief will be withheld. 2 A. Rathkopt, Law of Zoning, § 48–6 (3rd ed. 1972). However, the hardship at issue here—the failure of the configuration of Lot 17 to meet the lot-width requirement—cannot be accurately described as the direct consequence of the intervenors' sole and affirmative acts; here,

the zoning department employees played a significant part by approving three separate applications during the original subdivision of Lot 13. Having concluded that Section 5–420(3) authorized the Board to grant an area variance in this case and that the doctrine of self-created hardship, whatever its validity in this jurisdiction to area variances, is inapplicable on the facts of the present dispute, we are unwilling to disturb the decision of the Board.

*Affirmed.*

---

clear that the YMCA's difficulties stemmed directly from its decision to erect the facility on a small, irregularly shaped parcel of land.

13. In *Salsbery v. BZA, supra* at 404, and *A.L.W., Inc. v. BZA, supra*, it appears that the self-created hardship rule was found inapplicable to variances where the purchaser-applicant bought the property with knowledge of its nonconformity with the zoning regulations. In *A.L.W., supra* at 431–2, it is stated:

the fact that the owner knew or should have known of the area restrictions *before he purchased the property* does not alter the lesser standard [used in area variances as opposed to use variances]. In New York, for instance, the rule seems to be "that the 'self

created hardship' concept does not apply to area variance cases." [Emphasis added.]

In *Salsbery, supra* at 403–04, the applicant for a use variance purchased the commercial property without conditioning the contract upon the grant of a variance for a different nonconforming use. In that case, the economic hardship stemmed from the fact that the applicant made no efforts to protect his rights. In that context, the court's statement is entirely appropriate:

If there is hardship present, it stems from the fact that petitioner contracted to purchase the existing property . . . without conditioning the contract upon the securing of a use variance. A self-inflicted hardship, such as this, will not support the grant of a use variance. [*Id.* at 404.]