Lincoln Central Association *et al.,* Plaintiffs-Appellees, *v.* Zoning Board of Appeals *et al.,* Defendants-Appellants.

(No. 60163;

First District (3rd Division)—June 19, 1975.

Torshen, Fortes & Eiger, of Chicago, for appellants.

Richard L. Curry, Corporation Counsel, of Chicago (Daniel Pascale and Richard F. Friedman, Assistant Corporation Counsel, of counsel), for appellees.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

Roosevelt Memorial Hospital desired to construct a five-story addition on adjoining land, and a three-level parking facility on a lot across the street from the hospital. The hospital is located on the northeast corner of Wisconsin and Hudson Streets, Chicago, in a residential district zoned R-5. Hospitals are a permitted use in an R-5 residential district but the floor area ratio in such districts is limited to 2.2. The ratio in Roosevelt's present building is 4.8. This has been permitted as a legal nonconforming use since the building antedated the 1957 ordinance which zoned the area R-5.

The proposed addition to the hospital would lower Roosevelt's overall floor area ratio from 4.8 to 3.5, but inasmuch as the ratio of 3.5 would be in excess of the 2.2 limitation, Roosevelt applied to the Chicago Zoning Board of Appeals for a variation. It also requested the board to approve its plans for the parking facility—an application for a special use in an R-5 district where such garages are prohibited.

Nearby residents objected to the proposals. Some appeared as individuals and others as members of a community organization, the Lincoln Central Association. At the conclusion of a 2-day public hearing the board granted both the variation and the special use.

The objectors filed complaints for administrative review, and the circuit court reversed the board's decisions. The court found that the board failed to establish a maximum floor-area ratio in respect to the proposed variation, erred in permitting a lesser amount of off-street parking than the zoning ordinance required, and that its decisions were both contrary to law and against the manifest weight of the evidence.

This is Roosevelt's third attempt to expand. In 1968, its applications for a variation to construct a 5-story addition and for a special use for parking purposes were denied by the zoning board. The circuit court overturned the board's decisions, but the appellate court affirmed them. (*Roosevelt Memorial Hospital v. Chaddick* (1970), 131 Ill.App.2d 83, 266 N.E.2d 755.) In 1971, the hospital tried again. This time the board ruled in its favor, but the circuit court disagreed. There was no appeal from the trial court's decision. The present attempt was initiated in 1973.

Once more the board ruled in Roosevelt's favor but, again, the circuit court disagreed. This time the hospital and the zoning board appealed. Although the board filed a separate appeal, it adopted the hospital's brief.

Before we reach the merits of the appeal, we must consider a collateral issue raised by the defendants that the objectors have no standing to maintain this action. The defendants argue that the trial court had no jurisdiction of the case since the objectors neither alleged nor proved that their property would be substantially affected by the board's decision; that it was their burden to allege and prove a direct injury, not merely that they would suffer in some indefinite way in common with the general neighborhood. Reliance is placed on this court's decision in *O'Hare International Bank v. Zoning Board of Appeals* (1972), 8 Ill.App.3d 764, 291 N.E.2d 349, where we stated that the right to review a final administrative decision is limited to parties of record whose rights, privileges or duties are affected by the decision; that a person seeking review has the burden of alleging and proving that he has the right to maintain the suit by reason of his standing as a party and because his rights are adversely affected or will be injured by the agency's ruling.

■■■ There are three answers to the defendants' argument: first, the objectors participated in every stage of the proceedings without protest. The defendants cannot advance on appeal a point they did not raise either before the board or the court. Second, the *O'Hare-Park Ridge* case was decided under a statute which differed from the one under which the present case was decided. A 1969 amendment provided that in municipalities of 500,000 or more population, judicial review was allowed to any property owner within 250 feet of the property for which zoning relief was requested if the owner entered his appearance and objected before the board of appeals and showed that his property would be substantially affected by the outcome of the decision of the board. (Ill. Rev. Stat. 1969, ch. 24, par. 11—13—7.) Some of the objectors in the present case owned property within 250 feet of Roosevelt Hospital, and they made the requisite showing. Third, a variation of the kind requested in this case, with the increased traffic and parking problems a larger hospital would generate, could not help but have some adverse effect upon nearby residential property. The objectors not only have the right to contest the board's decision, but Roosevelt's attempt to stop them comes too late.

Roosevelt's substantive contention is that it proved its need to expand in order to serve its patients and the public, therefore the variation and the special use were properly permitted and the trial court abused its discretion in overruling the decisions of the board. The objectors dispute

this contention and point to alleged deficiencies in Roosevelt's proof, among them: the failure to show that the hospital, as presently operated, could not yield a reasonable return either to its own corporation or to the owner from whom the property was leased; the failure to show why it could not construct the facilities it claimed were needed within its present building; the failure to prove that a 55% increase in the number of beds was necessary, and the failure to prove that the construction of an additional building and the erection of a garage would not be detrimental to the public welfare or endanger the public safety.

With the exception of several nonconforming uses such as hospitals and institutions, the area surrounding Roosevelt Hospital is residential, and near the hospital there are many single-family homes. New townhouses are being built and older residences are being renovated. Witnesses testified that due to the remodeling and new construction the area was in transition, vacant land was at a premium, property values were rapidly increasing and would in all likelihood continue to do so. Two real estate experts who testified for Roosevelt stated that in their opinion property values would not be adversely affected by the hospital's proposed expansion and that it would not be detrimental to the public welfare.

The present five-floor building, which had prior use as a hospital, was leased by Roosevelt in 1960. The addition, on land north of the hospital which Roosevelt acquired for this purpose in 1968, would also be five stories high. The floors of the two buildings would be at the same level and connected by passageways. The hospital plans contemplate a truck-loading dock and an ambulance entrance on Hudson Avenue—a street on which single-family homes predominate.

Roosevelt provides all hospital services except obstetrics and pediatrics. It has 90 to 100 physicians on its staff and employs 320 people. It generally operates at 90% of its 144-bed capacity. In an 8-month period—June 1, 1972, through January 31, 1973—3,115 patients were admitted and 4,669 received emergency treatment. Testimony presented by Roosevelt was to the effect that the construction of the additional building would enable it to install badly needed laboratory, x-ray and accessory health care facilities, to expand its anesthesia, diagnosis, nuclear medicine, therapy and emergency room facilities, and to enlarge the number of its beds from 144 to 224. The 80-bed increase would be in the modern, more efficient six-sided addition and would enhance the hospital's capacity to treat its patients. An official of the hospital testified that if the hospital did not have more space its medical quality would decrease, its accreditation and staff service would become problems and it would be unable to adopt and keep abreast of medical developments. It was stated

that the requested variation was not to make more money but to maintain an efficient, functional hospital and to rehabilitate the existing building to provide necessary hospital services to the immediate community and to the area around the community.

Roosevelt's zoning and real estate experts also testified that the proposed parking facility, which would have entrances and exits on Wisconsin Avenue, would relieve traffic congestion and would not cause hardship to the surrounding property owners. At the time of the hearing, Roosevelt staff members, employees and visitors parked their autos in nonadjacent lots. The proposed facility would be across the street from the hospital on the southeast corner of Wisconsin and Hudson; it would have one underground and two aboveground floors and would accommodate 150 cars which Roosevelt contended would meet the minimum requirements of the zoning ordinance for hospital personnel and visitors. (Municipal Code of Chicago, ch. 194A, sec. 7.12—2(6).) The building would rise 13 feet above the street level and would have a 4'6" wall of solid masonry. There would be a 15' front yard on Wisconsin Avenue and a 7'6" side yard on Hudson. The latter would be in keeping with the front yard setbacks of the residential buildings on Hudson Avenue. The structure would also have a 30' rear yard and it, and the front and side yards, would be landscaped.

The objecting neighbors voiced their fears that the expansion would decrease the value of their homes, would greatly increase traffic, particularly on heavily-traveled Wisconsin Avenue, where a playground is located a block from the proposed garage, and would endanger the many small children who live on Wisconsin and Hudson Avenues. The opinions of the objectors, both as to the property values and the traffic problems that would be engendered by the parking facility, the loading dock, the emergency ambulance entrance and the 55% increase in bed capacity, were supported by expert testimony.

The hospital's desire to increase in size, in bed capacity, in services and in prestige has a great natural appeal, but the achievements of these goals depends upon more than its desire; it must comply with the standards of proof required by State statutes and City ordinances. The statute concerning zoning regulations in municipalities of 500,000 and more population states:

> "Variations shall be permitted by the board of appeals only when they are in harmony with the general purpose and intent of the regulations and only in cases where there are practical difficulties or particular hardship in the way of carrying out the strict letter of any of those regulations relating to the use, construction, or alteration of buildings or structures or the use of land. In its con-

sideration of the standards of practical difficulties or particular hardship, the board of appeals shall require evidence that (1) the property in question cannot yield a reasonable return if permitted to be used only under the conditions allowed by the regulations in that zone; and (2) the plight of the owner is due to unique circumstances; and (3) the variation, if granted, will not alter the essential character of the locality. A variation shall be permitted only if the evidence, in the judgment of the board of appeals, sustains each of the 3 conditions enumerated." (Ill. Rev. Stat. 1971, ch. 24, par. 11—13—4.)

The Chicago zoning ordinance incorporates these standards. (Municipal Code, ch. 194A, sec. 11.7—3.) In addition, section 11.10—4 of the ordinance states that no special use shall be granted unless it,

"(1) a. Is necessary for the public convenience at that location;

b. Is so designed, located and proposed to be operated that the public health, safety and welfare will be protected; and

(2) Will not cause substantial injury to the value of other property in the neighborhood in which it is to be located; and

\* \* \*

(4) Such special use shall conform to the applicable regulations of the district in which it is to be located."

The zoning board determined that Roosevelt was faced with particular hardships; that granting the variation would remove the restriction on its growth and enable it to have updated ancillary services and an efficient and functional hospital. It also determined that the special use authorizing a three-level parking facility was necessary to fulfill the off-street parking requirements of the enlarged institution, and that the facility's design, location and operation would adequately protect the public health, safety and welfare. There can be little quarrel with the findings that the zoning regulations posed practical difficulties for the hospital and that relaxing the regulations would permit it to expand its services, and that a larger hospital would require additional parking spaces. The finding that the public welfare and safety would be protected by the parking facility was supported by substantial evidence. If this were all that mattered the answer would be simple, for an administrative agency's findings of fact are considered prima facie true (Ill. Rev. Stat. 1971, ch. 110, par. 274), and they will not be disturbed on review unless they are against the manifest weight of the evidence. (*River Forest State Bank & Trust Co. v. Zoning Board of Appeals* (1961), 34 Ill.App.2d 412, 181 N.E.2d 1.) But there are other problems that must be considered: the deficiencies in the hospital's proof and the findings of the board which were not supported by the evidence.

The board found, as the statute required, that the plight of the owner was due to unique circumstances. The uniqueness, according to the board's finding was "that the subject site abuts the existing hospital structure and is the only available area for the proposed expansion * * *." There was nothing about the site itself in physical surroundings or topography that would make compliance with the floor area ratio a particular hardship. On appeal, the applicant explains its concept of uniqueness: its present building is a single-purpose structure which would be without function if Roosevelt were to vacate it; an addition is necessary to its continued viability as a hospital, and for this purpose the utilization of the parcel of land contiguous to its building is required. This argument depends on proof that the hospital must indeed expand to remain viable and expand to the point where a variance is needed. Our consideration of the other requirements for a variance makes it clear to us that the hospital does not have to expand to the extent of its current request. It has not proven that the expansion which it claims is required could not be accomplished with a lesser variance or no variance at all.

■■ Throughout the hearing before the zoning board the hospital presented evidence of its own needs. The objectors question whether a variation can be granted on the needs of a tenant rather than on those of the owner. Usually a tenant's plight would not be relevant. A building variation runs with the land (Rathkopf, Law of Zoning and Planning 46—1, 46—2 (3rd ed. 1972)), and a tenant's interest is limited to a term of years. A building may have many tenants. If each tenant in an office building, apartment building or shopping center were permitted to obtain relief from zoning restrictions because of his own needs, absurd consequences could result. Or if but one tenant were able to demonstrate hardship due to unique circumstances and thus secure a variation, the other tenants could benefit or suffer because of it. In this case, the hospital's needs and its functions were considered to the exclusion of the owner's. The nearest approach to evidence about the owner's plight was his testimony that his loss would be irreparable if his building ceased to be occupied by a hospital. However, Roosevelt is bound under a lease with 30 years to run, the rent does not vary and there was no suggestion that Roosevelt would vacate the building if the variance were not granted.

■■■ Despite the fact that the statute and ordinance speak only of the owner's plight and require that it be unique, we have considered Roosevelt's position as being relevant to its request for a variation. We have done so for the following reasons: first, Roosevelt Hospital is a long-term lessee and there is some logic and some authority for the proposition that in zoning matters such a lessee is entitled to the rights and privileges of an owner. In S. S. *Kresge Co. v. City of New York* (1949), 87 N.Y.S.2d

313, 194 Misc. 645, the court interpreted a statute that required proof before a building permit variation could be granted that the land did not yield a fair return on its value to its owner. Under their long-term lease with Kresge, an operator of retail stores, the owners of the property were receiving a fair return. The court said that it was fair to assume that the legislature meant to afford the remedy of variances not only to owners but also to those who had a substantial interest in the property and who would sustain damage if they were denied the full use of their property without just compensation. The court declared that Kresge, because of its lease and authority to demolish existing buildings and to erect new ones on the property, came within the reason and spirit of the statute, although not within its strict letter, and that in a real sense it stood in the shoes of the owner and was entitled to the same rights and privileges. Second, the building occupied by Roosevelt is a single-purpose building with limited marketability if Roosevelt were to vacate it. Although Roosevelt has not threatened to breach its lease, it is important to the owner to retain the current tenant. Under the circumstances, the building's unsuitability for its single purpose becomes a common concern of both the tenant and the owner and their interests can be equated. See *Weaver v. Zoning Board of Appeals* (1970), 130 Ill.App.2d 1052, 264 N.E.2d 758, which dealt with a single-purpose bank building which had become too small for the tenant-bank which occupied it. Third, Roosevelt is the owner of the land on which the addition is proposed to be built so that its interest is more permanent than that of a simple tenant.

■■ Having come to the conclusion that Roosevelt's position is relevant to the grant of a variation, we note that neither it nor the building's owner proved the lack of a reasonable return on the property as presently used. Neither presented any evidence whatsoever on the subject. They not only failed to produce evidence of financial status but successfully resisted all efforts of the objectors to learn about it. The owner did not reveal the price he paid for the property, its current market value or its encumbrances; he did not disclose the rent he received or the taxes he paid. Roosevelt offered no proof that the land north of the hospital could not yield a reasonable return if it were improved in conformity with the zoning regulations. It objected to and persuaded the board to quash a subpoena duces tecum for its records; it objected to the production of its lease; it refused to divulge the amount of its rent. The absence of relevant data makes it impossible to evaluate the financial return from the property. See the treatment of the requirement in *Bayer v. Zoning Board of Appeals* (1970), 126 Ill.App.2d 374, 261 N.E.2d 791; *Reichard v. Zoning Board of Appeals* (1972), 8 Ill.App.3d 374, 290 N.E.2d 349;

*Asbach v. Zoning Board of Appeals* (1971), 133 Ill.App.2d 22, 270 N.E.2d 535.

Roosevelt's position throughout the zoning hearing was that it was not bound by the literal requirements of the zoning laws; that as a hospital which wanted to expand its facilities and services, a different standard applied to it than to other property. This position is reminiscent of the one it took in its first attempt to obtain a variation. In that case, this court observed, "The hospital offered practically no evidence which related to the standards for variations as set forth in the ordinance. * * * The evidence offered by the hospital primarily concerned the need for the hospital to expand * * *." *Roosevelt Memorial Hospital v. Chaddick* (1970), 131 Ill.App.2d 82, 266 N.E.2d 755.

■■■ Roosevelt argues that it cannot show lack of reasonable return to satisfy the requirement of the zoning statute and ordinance because it is a not-for-profit corporation. Roosevelt ignores any possible relevance of the owner's reasonable return which, one must assume, is secure during the present lease. It argues that a reasonable return for a hospital *is* the reasonable use of the property for the performance of its functions regardless of whether such functions earned a financial profit or operated at a consistent loss. While not-for-profit corporations organized for charitable purposes are accorded special treatment under several laws, neither the General Assembly nor the City Council gave them preferred treatment in the zoning laws, and we find no authority in Illinois or in other jurisdictions (absent specific statutory provisions) to distinguish them for zoning purposes from other corporations. Still, the requirement concerning a reasonable return seems particularly ill-suited to a nonprofit hospital. But even if the standard proposed by Roosevelt for such hospitals were to be applied in this case, the evidence compels the conclusion that the reasonable use of the property for the performance of hospital functions does not require a variance of the size requested. The hospital's evidence established its need for more medical equipment, but it did not establish what part of the addition would be used for the equipment. There was no proof that the equipment could not be adequately housed in an annex built in conformity with the permissible 2.2 floor area ratio. It would appear that it is the increase in the number of beds, a 55% increase, that is the principal reason why the floor area ratio of the proposed annex exceeded the maximum permitted ratio. The hospital offered no evidence why the beds were needed. There was testimony that the bedrooms would be arranged in a modern and efficient fashion, in closer proximity to nursing and medical personnel and with more space and light, but there was no testimony why the hospital, which operated

at less than 100% capacity, required 80 more beds, and there was no evidence that the community, the intermediate area, or the north side of Chicago had a shortage of hospital beds. The evidence showed that Roosevelt and four hospitals which were close to it had a total of 1324 beds which is a bed-population ratio of 25 to 1,000 as compared to the City of Chicago's overall ratio of 4.7 beds to 1,000 persons. Further, there was no evidence that increasing the number of hospital beds irrespective of location or indicated need was, per se, either sound medical practice or institutionally advisable.

For the first time in its reply brief, the applicant explains that more beds are required because the cost of the new medical equipment would have to be spread over more than the existing number of beds to enable the hospital to give patient treatment at a reasonable per patient cost. This reasoning was not before the zoning board. Also, in its reply brief, the applicant argues that zoning regulations which require proof of the failure to yield a reasonable return are unconstitutional in their application to Roosevelt Hospital because, as a not-for-profit corporation, it is manifestly impossible for it to show a lack of reasonable return. It is unnecessary to entertain the constitutional argument because it is raised for the first time on appeal and this court has found that even under a special standard for hospitals, Roosevelt did not establish its need for the variance it requested.

■■  Roosevelt's request for a special use to erect a parking facility is tied into its request for a building variation. It had the burden of proving that the garage would provide enough parking spaces to satisfy section 7.12—2(6) of chapter 194A of the Municipal Code of Chicago which provides:

> "(6) Hospitals. One parking space shall be provided for each three hospital beds, plus one parking space for each three employees (other than doctors), plus one parking space for each doctor assigned to their staff."

Roosevelt contends that 150 parking spaces satisfies the requirements of section 7.12—2(6). In calculating the required number of parking spaces, Roosevelt figured on the number of patients it would have with the new addition—224—and it allowed for the same number of doctors and employees as are presently at the hospital. The medical director of Roosevelt testified that only courtesy and consulting doctors would be added and that no new staff doctors would be needed, but no one testified how many more employees would have to be hired. In *Roosevelt v. Chaddick* the hospital predicted that the increase of 120 beds would necessitate 45 more employees. On the basis of this scale, an increase of 80 beds would require 30 more employees. But irrespective of whether or not this

exact scale is used, it is obvious that an increase of 80 more beds would necessitate more than the present number of employees. For this reason, the number of parking spaces allotted for employee use in the garage would be insufficient and the proposed garage does not satisfy the requisites of section 7.12—2(6).

Moreover, the evidence contradicted Roosevelt's assertion that the garage would accommodate 150 cars. A letter from the commissioner of the Department of Development and Planning of the City of Chicago which was made part of the record before the zoning board stated that unless the garage was widened by at least 4.5 feet, cars would have to park at an angle rather than perpendicularly as planned. Diagonal parking would reduce the capacity of the garage. The commissioner also stated that an additional ramp would be required. The additional ramp would further reduce the parking capacity. Roosevelt did not prove that the proposed garage would accommodate 150 cars, let alone the higher number that our discussion has shown would be needed.

The trial court's order reversing and setting aside the decision of the Zoning Board of Appeals of the City of Chicago which granted the variance and special use to Roosevelt Hospital is affirmed.

Affirmed.

McNAMARA and MEJDA, JJ., concur.