Lawrence A. MONACO, Jr., Petitioner,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,

William Brock and William McManus, Intervenors.

No. 13321.

District of Columbia Court of Appeals.

Argued Dec. 5, 1978.

Decided Nov. 5, 1979.

Rehearing En Banc Denied
Jan. 8, 1980.

---

Lawrence A. Monaco, Jr., pro se.

Richard W. Barton, Deputy Corp. Counsel, and Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., entered appearances for respondent and adopted the brief of the intervenors.

Norman M. Glasgow, Washington, D. C., with whom Whayne S. Quin and Norman M. Glasgow, Jr., Washington, D. C., were on the brief, for intervenors.

Before KERN and GALLAGHER, Associate Judges, and YEAGLEY, Associate Judge, Retired.

GALLAGHER, Associate Judge:

Petitioner appeals the Board of Zoning Adjustment's (BZA's) grant of a variance to Capitol Hill Associates, intervenors below,[1] under Section 8207.11 [2] of the Zoning Regulations. Intervenors sought a use and area variance in order to extend Republican National Committee offices located in an R–4 district bordering the Capitol grounds.

Intervenors maintain that historical factors, the relationship with Congress, and

---

1. Messrs. Brock and McManus are trustees for the Republican National Committee, beneficial owners of the property. Capitol Hill Associates, the applicant before the BZA, was under contract to convey the property to the Republican National Committee.

2. District of Columbia Zoning Regulation § 8207.11, adopted pursuant to D.C.Code 1973, § 5–420, provides as follows:

8207.11. Where, by reason of exceptional narrowness, shallowness, or shape of a specific piece of property at the time of the original adoption of the regulations or by reason of exceptional topographical conditions or other extraordinary or exceptional situation or condition of a specific piece of property, the strict application of any regulation adopted under this Act would result in peculiar and exceptional practical difficulties to or exceptional and undue hardship upon the owner of such property, to authorize, upon an appeal relating to such property, a variance from such strict application so as to relieve such difficulties or hardship, provided such relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan as embodied in the zoning regulations and map.

past actions of the BZA and Zoning Commission create an "extraordinary or exceptional situation or condition" so as to fulfill the statutory variance requirement.[3] Intervenors reason further that due to the same historical circumstances, they will suffer "undue hardship" if not allowed to expand according to plans of 20 years' duration formed with the ostensible consent of the zoning authorities. Finally, intervenors maintain that the proposed building extension will not undermine the zone plan, but rather will provide a harmonious transition between the Capitol buildings and the surrounding residential neighborhood.

The BZA ruled with intervenors and granted a variance. Petitioner Monaco[4] argues primarily that the Board misapplied the variance law in finding unique circumstances and undue hardship in historical factors personal to intervenors and unrelated to the property in question. A secondary issue is whether the BZA's finding of no detriment to the neighborhood is supported by substantial evidence. Petitioner also contends that the BZA admitted into the record intervenors' proposed findings of fact and conclusions of law after the public hearing was concluded, violating its own rules and the District of Columbia Administrative Procedure Act.[5]

The historical circumstances on which intervenors base their claim of exceptional situation and undue hardship began in 1960 when the United States government condemned Republican National Committee property in order to construct the Madison Library. Because of intervenors' close relationship with Congress, they wished to relocate on the perimeter of the Capitol. They found and acquired other suitable property in an R–4 district one block to the south on First Street, S.E., running from "C" Street almost to "D" Street. The site of the present dispute includes roughly the southernmost third of that property, with the addition of lot # 816 on the corner of 1st and "D" Streets, acquired more recently.

In 1961, intervenors filed an application to the Zoning Commission to change the classification of the northern portion of their new site from an R–4 to an SP zone. An office building would have been permitted as of right in an SP zone, and would not have been subject to the R–4 height restrictions. The House Office Building Commission approved the relocation of Republican National Committee headquarters, but was concerned that height restrictions be maintained. After negotiations with intervenors, the Zoning Commission, and the Architect of the Capitol, it was agreed that the Zoning Commission would defer decision of the zone change, and intervenors would proceed by means of a series of variances, which, unlike a zone change, could be conditioned on low building height.

A height limitation of 40 feet at the corner of 1st and "C" Streets, along with design restrictions, were embodied in a covenant between the House Office Building Commission and intervenors. This covenant was incorporated by reference in the grant of several variances to intervenors. The same covenant provided that the United States had a right of first refusal to purchase the land and improvements at the lesser of cost or fair market value.

Intervenors proceeded with their building plans in three parts: the Capitol Hill Club, and a two-stage office building. The BZA granted variances for the Capitol Hill Club in appeal # 6348 (June 21, 1961) and # 8288 (July 14, 1965); for the first stage of the office building in # 8183 (December 22, 1965); and for the second stage of the office building in # 8834 (November 8, 1966). Although the Capitol Hill Club and the first stage of the office building were completed, construction of the second stage was postponed for lack of funds. The vari-

3. D.C.Code 1973, § 5–420, is substantially identical to Zoning Reg. § 8207.11, *supra* note 2.

4. Mr. Monaco resides at 123 C Street, S.E., in the same block as the subject site.

5. D.C.Code 1973, §§ 1–1501—1–1510.

ance lapsed after six months.[6] This case is an appeal of the BZA's grant of another variance for the stage two office building. The proposed office addition is designed to join the existing building and use the same engineering systems. It is slightly modified from the plan approved in the mid-1960's in order to cover newly acquired lot # 816 and extend all the way to "D" Street.

A landowner must meet three requirements for a use variance: (1) unique physical aspect or "other extraordinary or exceptional situation or condition of a specific piece of property," (2) undue hardship, and (3) no harm to the public or to the zone plan.[7] Petitioner claims that intervenors met none of the three requirements, and that the BZA applied an incorrect standard for determining uniqueness and undue hardship. Firstly, he contends that the *physical* aspect of the property must be unique. Here the subject site would equal four perfectly ordinary lots, suitable for permitted townhouses. Furthermore, because the land could be used for townhouses, says petitioner, intervenors would suffer no undue hardship by conforming to the R–4 zoning. Lastly, he claims that the expansion of an office building in a block developed primarily with row houses would deter the public good and undermine the integrity of the zone plan.

The BZA made a conclusion of law in respect to the first variance requirement, unique physical aspect or "other extraordinary or exceptional situation or condition of a specific piece of property."

1. The subject site is affected by an exceptional situation as a result of the history of the creation of this property as the site upon which the Republican National Committee Office building would be located through previously granted variance relief. The property is also uniquely affected by an agreement between the House Office Building Com-

mission and Capitol Hill Associates, Inc., which limits the use of the subject property to offices for the Republican National Committee and its affiliates, provides that all plans for exterior facades should be subject to the approval of the Architect of the Capitol and that the United States Government shall have the right of first refusal to purchase the property in the event of a sale of that premises to any person other than the Republican National Committee. The applicant has made major expenditures on the building and land on the basis of prior actions of the Zoning Commission and the Board of Zoning Adjustment.

A finding of fact is also relevant to the question of uniqueness:

11. [W]hen the Republican National Committee first embarked on the Eisenhower Center project it was the understanding of the Committee that an accommodation to provide space for it would be provided as the United States Government acquired its former site at First and Carroll Streets, S.E. by condemnation, that the applicant found it necessary to obtain another location in the Capitol Hill area because of its unique relationship with members of Congress and other personnel located on Capitol Hill and that this unique situation is evidenced by the existence of an agreement dated July 19, 1965, between the House Office Building Commission and Capitol Hill Associates, Inc.

In sum, the BZA considered four factors in applying the uniqueness or other extraordinary circumstances test:

A. The Republican National Committee's close relationship to Congress and location of property near Congress;

B. existence of stage I of the office building;

---

**6.** *See* Zoning Regs. §§ 8205.11, 8205.12.

**7.** *See* D.C.Code 1973, § 5–420; Zoning Regs. § 8207.11, *supra* note 2; *Otto v. Steinhilber*, 282 N.Y. 71, 24 N.E.2d 851, 853 (1939). In *Palmer v. Bd. of Zoning Adjustment*, D.C.App.,

287 A.2d 535, 541 (1972), this court held that an applicant for a use variance, as in this case, must meet the higher standard of "undue hardship" rather than the "practical difficulties" required to justify an area variance.

C. past actions of the Zoning Commission and BZA which led them to begin construction in that location;

D. the right of first refusal and restrictive covenant held by the House Office Building Commission which limits the use and design of the building.

Petitioner maintains that none of these factors may be used to justify a variance. Rather, he contends the extraordinary circumstances must be limited to physical aspects of the land. We disagree with petitioner's narrow interpretation of the phrase "other extraordinary or exceptional situation or condition of a specific piece of property." Though we recently rejected the possibility that unique circumstances could refer · to the personal misfortunes of the applicant or to the previous use of the property. *Capitol Hill Restoration Society, Inc. v. Board of Zoning Adjustment*, D.C.App., 398 A.2d 13 (1979), in that case the subject site was a row house of design, size, and acreage similar to others in the neighborhood. There were no unusual circumstances, as there are in this case, involving the presence of an office building, or the influence and proximity of the Capitol affecting the neighborhood. Furthermore, the history we referred to ·in *Capitol Hill Restoration Society, Inc., supra,* was merely the previous illegal use made of the property by the owner, whereas the history material to this case consists of past actions of the zoning authorities.

Those past actions are the critical factors which have caused the Republican National Committee's present predicament. In *DeAzcarate v. District of Columbia Board of Zoning Adjustment*, D.C.App., 388 A.2d 1233 (1978), an area variance case, we found that a similar past history of zoning approvals gave rise to uniqueness. We said in *DeAzcarate* that

> [i]n effect, the extraordinary or exceptional condition which is the basis for a use variance need not be inherent in the land, but can be caused by subsequent events extraneous to the land itself, such as the failure of [a] seminary to remain a viable institution . . . . In our view, that term was designed to serve as an

additional source of authority enabling the Board to temper the strict application of the zoning regulations in appropriate cases . . . . [*Id.* at 1237.]

■ The four factors which the court found significant in upholding the grant of a variance in *DeAzcarate* were (1) the original property owned by the variance applicant could have been divided into three conforming lots; (2) zoning office personnel, on three occasions, implicitly found that the lot in question conformed to area requirements; (3) applicant proceeded in good faith to rely on said division, and built houses on the other two newly created lots; and (4) the present dispute was caused by zoning officials' erroneous action. *Id.* at 1238. Here, intervenors could originally have located elsewhere or possibly secured a zone change for the site. However, the Zoning Commission and House Office Building Commission implicitly approved the site and indicated that intervenors should proceed by means of variance. Moreover, the BZA granted variances for the greatest part of the project. Intervenors proceeded in good faith to construct the Capitol Hill Club and stage one of the office building and secured a variance for the second stage of the office as well. These actions by the zoning authorities provided implicit assurance that the project could be completed. *See Jayne Estates, Inc. v. Raynor*, 22 N.Y.2d 417, 425, 293 N.Y.S.2d 75, 81, 239 N.E.2d 713, 717 (1968) (difficulty which sets a property apart from its neighbors need not be physical but can stem from the zoning history of the case).

■ Petitioner reasons that the grant of a variance in 1966 cannot be considered because it lapsed after six months and thus has no res judicata effect. Even though the variance for the final stage lapsed, intervenors' reliance on eventual approval was nevertheless in good faith. As a New York court explained, the reason for having a time limitation on a variance "is to insure that in the event conditions have changed at the expiration of the period prescribed the board will have the opportunity to reap-

praise the proposal by the applicant in the light of the then existing facts and circumstances if the latter still desires to proceed." *In re Goodwin,* Sup.Ct.N.Y., N.Y.L.J., July 5, 1962, as quoted in 3 A. Rathkopf, The Law of Zoning and Planning § 38.06[2] (4th ed. 1979) (variance rights should not be lost through delay in exercise if conditions remain the same). *See also Madden v. Zoning Board of Review,* 89 R.I. 131, 151 A.2d 681 (1959); *Nuckles v. Allen,* 250 S.C. 123, 156 S.E.2d 633 (1967) (board without authority to revoke a variance on which a subsequent owner has relied).

When the BZA reassessed the neighborhood and the project after the 12-year interval, it found circumstances were still favorable to the project. The intervenors rationally could have expected a favorable evaluation when the major change in the neighborhood was installation of the Metro across the street which would reduce the vehicular traffic effects on the surrounding neighborhood. Thus, we find that intervenors showed the same type of good faith detrimental reliance on zoning actions as was shown in *DeAzcarate,* where such zoning actions were found to contribute to uniqueness.

 Given that the past zoning history can be taken into account in the uniqueness facet of the variance test, we now turn to an examination of the resulting situation as it exists today to assess whether the BZA erred in considering the needs of the Republican National Committee, the proximity of the site to the Capitol, the restrictive covenant, and existence of the first two buildings as contributing to uniqueness.

Petitioner relies upon this court's decisions in *Taylor v. Board of Zoning Adjustment,* D.C.App., 308 A.2d 230 (1973) and *Palmer v. Board of Zoning Adjustment,* D.C.App., 287 A.2d 535 (1972), to support his contention that "uniqueness" is limited to physical characteristics of the land. In *Taylor,* however, we merely interpreted the uniqueness test to mean that petitioner's property must be subject to some difficulty not shared by the entire neighborhood, and did not say the difficulty must be a physical

condition. Here, the subject site is distinguished from the rest of the R–4 district because it is closer to Capitol grounds. While it might be argued that the entire residentially zoned neighborhood around the Capitol is subject to the same condition, immediate proximity has sometimes been used to distinguish a property from its neighbors in general proximity to a particular building. *See, e. g., Peirce v. Zoning Board of Adjustment,* 410 Pa. 262, 189 A.2d 138 (1963) (property immediately adjacent to a sewage pumping station and to an industrial park entrance considered unique from other property in same general neighborhood).

 In *Palmer, supra* at 540, we held that the attempt or desire to utilize property for a certain use was not by itself enough to create an "extraordinary or exceptional situation or condition" under the zoning regulations, but we did not define precise limits to the phrase. Referring to decisions from other jurisdictions, the court did mention economic conditions, *id.* at 539, and character of surrounding uses, *id.* at 540, as possible criteria for determining uniqueness along with topography and geographic factors. The Republican National Committee's wish to move to the subject site does not make the site unique. Nevertheless, the site is uniquely suitable for their headquarters because of the surrounding use, the Capitol. While a commercial user before the BZA might not be able to establish uniqueness in a particular site's exceptional profit-making potential, we consider that the BZA may be more flexible when it assesses a non-profit organization which is a well established element of our governmental system. As Professor Anderson has observed, public need for the use is an important factor in granting or denying a variance and "the apparently objective standards of the enabling acts are applied differently to the several kinds of uses . . . ." 3 R. Anderson, American Law of Zoning § 14.78 (1968).

 The restrictive covenant between intervenors and the House Office Building Commission provides evidence of the unique

relationship with Congress. The restrictions contained there also may be considered in their own right as an extraordinary condition of a particular piece of property, since they effectively restrict design, height, and use to that which the BZA considered compatible with surrounding residential and governmental properties. In *Capitol Hill Restoration Society v. Zoning Commission*, D.C.App., 380 A.2d 174, 184–85 (1977), a case involving a petition for rezoning, we held that private restrictive covenants properly may be considered in zoning decisions.

■ The fact that a building has already been constructed on the adjoining property is another factor which may be considered in finding uniqueness. In *Clerics of Saint Viator, Inc. v. District of Columbia Board of Zoning Adjustment*, D.C.App., 320 A.2d 291 (1974), we stated that existing structures are as important as topography in creating "other extraordinary or exceptional situation or condition of a specific piece of property." *Id.* at 294. Petitioner argues that the existing building is not on the subject site, and thus cannot be taken into account. Only occasionally are cases found in which a variance is granted on one parcel to remedy the deficiencies of another. *See Kenmore Joint Venture v. District of Columbia Board of Zoning Adjustment*, D.C. App., 391 A.2d 269 (1978) (apartment previously granted special exception to use adjoining R–1–B lots for parking); *In re Freid-el Corporation*, 34 Pa.Cmwlth. 341, 383 A.2d 1286 (1978) (grant of variance for expansion of townhouses based on dictates of business). *Cf.* 2 R. Anderson, *supra*, § 14.29.

The characterization of the use as a public service will again be significant. For example, "A commercial nonconforming user who needs parking facilities cannot satisfy the requirement for a use variance . . . without proving that the proposed site will not yield a reasonable return for a conforming use, that the difficulty is caused by unique circumstances, that the use will not materially alter the neighborhood. No such burden is usually imposed on a hospi-

tal." 2 R. Anderson, *supra*, § 1478. See also *Lincoln Central Association v. Zoning Board of Appeals*, 30 Ill.App.3d 258, 332 N.E.2d 510, 517 (1975), in which the court accepted a different type of uniqueness for a hospital than for an ordinary commercial user. The hospital, as a single purpose structure, argued that an addition was necessary to its continued viability, and so it needed a variance to expand into a contiguous parcel of land. The court adopted the hospital's proposed uniqueness test, but held that the hospital had not properly documented its need to expand in the proceedings below.

■ Another significant factor in determining if inadequate buildings on one parcel may constitute extraordinary situation for another parcel is whether the two parcels are contiguous and under common ownership. Pennsylvania courts allow variances to be granted for the normal expansion of a non-conforming use. "But nowhere in the law is there any support for a proposition that any supposed hardship to one non-contiguous piece of property owned by a separate entity can be shown to support an application for a variance to expand a non-conforming use to a completely separate property." *Snyder v. Zoning Hearing Board*, 20 Pa.Cmwlth. 139, 142, 341 A.2d 546, 548 (1975). In this case, not only is the subject site contiguous and in common ownership with intervenors' existing office building, but also the entire area between "C" and "D" Streets has been regarded as one site, subject to one plan, both by intervenors and by the Zoning Commission and Board of Zoning Adjustment.

■ Consequently, we conclude that when a public service has inadequate facilities and applies for a variance to expand into an adjacent area in common ownership which has long been regarded as part of the same site, then the Board of Zoning Adjustment does not err in considering the needs of the organization as possible "other extraordinary and exceptional situation or condition of a particular piece of property." Overall, the BZA considered permissible factors in applying the first branch of the

variance test. The site's proximity to the Capitol made it uniquely valuable to the Republican National Committee, a public service organization. The previously constructed buildings and the contiguous subject site can be considered together in applying the test especially because the past acts of the zoning authorities led intervenors to rely in good faith on their eventual consent to the final stage of the building. This case, like *DeAzcarate*, illustrates that extraordinary circumstances can encompass the past zoning history, as well as the physical features, of the property.

■ Applicants' good faith, detrimental reliance on previous zoning actions can also be relevant to determine undue hardships, the second branch of the variance test. The BZA property found undue hardship when

[t]he site located to the immediate south was acceptable to all parties involved at that time [1960's] and it was planned that eventually an office structure to house the Committee would occupy the entire site . . .. To deny the present application would thwart that plan and force the Committee to relocate on a less favorable site after a substantial investment in the present area and after reliance upon prior understandings. [Conclusion of Law No. 3.]

■ It is true that normally an owner suffers no undue hardship when his property can produce a reasonable profit in a permitted use. *Palmer, supra* at 542; *Otto v. Steinhilber*, 282 N.Y. 71, 24 N.E.2d 851 (1939). Petitioner contends that the subject site could profitably be used for townhouses, and that the Republican National Committee's need for more office space is irrelevant. In support of this contention, petitioner cites a number of cases where an owner sought to expand an existing use,

but a variance to expand was denied because the limited profitability of the existing use did not establish undue hardship. *Hamilton v. Board of Supervisors*, 269 Cal. App.2d 64, 75 Cal.Rptr. 106, 110 (1969) (fact that cottage hotel would be more profitable if expanded does not justify variance when property can be put to effective use under existing zoning); *Hyatt v. Zoning Board of Appeals*, 163 Conn. 379, 311 A.2d 77, 79 (1972) (maximum enrichment of owner and highest and best use are irrelevant to establish unusual hardship peculiar to a parcel of land); *Scaduto v. Town of Bloomfield*, 127 N.J.L. 1, 20 A.2d 649, 650 (1941) (finding that land is not solely suitable for permitted residences, but might also be suitable for stores, is not sufficient to establish undue hardship); *North Shore Steak House, Inc. v. Board of Appeals*, 30 N.Y.2d 238, 282 N.E.2d 606, 608, 331 N.Y.S.2d 645, 648 (1972) (that property would be more valuable as parking for restaurant owner applicant is insufficient to warrant a hardship variance when the property could reasonably be used for conforming housing); *Griffin v. Zoning Board of Review*, 98 R.I. 233, 200 A.2d 700 (1964) (slight profitability of existing nonconforming diner did not warrant variance for expansion to size contemplated by original owner before R–2 zoning was adopted); *Hall v. Zoning Board of Review*, 93 R.I. 65, 170 A.2d 912, 913 (1961) (nursing home's present unprofitability because of small size will not support a claim of unnecessary hardships for a variance to expand). Petitioner also cites *Palmer, supra* at 542 (tenant's desire to use the building as public hall does not signify that owner could not profitably rent to others for a permitted use); *Clerics of Saint Viator, supra* at 296 (must show that old seminary building cannot be put to any conforming use).[8]

8. Two other cases relied upon by petitioner illustrate the difficulty in applying the undue hardship test to nonprofit organizations. In *Lincoln Central Association v. Zoning Board of Appeals, supra*, 30 Ill.App.3d at 267, 332 N.E.2d at 517, the test of undue hardship for a hospital was whether the variance was needed for the reasonable performance of hospital functions. In *Appeal of the Catholic Cemeteries Association*, 379 Pa. 516, 109 A.2d 537, 540 (1954), the majority of the Supreme Court of Pennsylvania evaluated a religious association's undue hardship in regard to its request for a variance to locate a cemetery in a residential zone in light of the association's ability to find a suitable cemetery tract outside of a residential zone. But we need not reach the issue of whether a nonprofit owner experiences undue hardship if it cannot expand as necessary to perform its public service function.

In this case, however, intervenors' hardship stems from an additional factor not present in any of the cases cited by petitioner, namely, their reliance on actions of the zoning authorities in locating at their present site, in partially completing their facilities, and in forming a covenant with the House Office Building Commission which will greatly reduce the value of their present investment if intervenors should move to another site. If they were forced to move due to overcrowding, they could not realize a reasonable return on their substantial investment in the previously constructed building. They would have to offer their buildings to the House Office Building Commission at cost, not because of their own poor bargaining power, but because of their reliance that accommodation would be made to allow expansion at the present site. Thus, we conclude that good faith, detrimental reliance on the zoning authorities' informal assurances may be taken into account in assessing intervenors' undue hardship under variance law. *See Jayne Estates, Inc., supra; Iacobelli v. City of Rye*, 64 App.Div.2d 888, 407 N.Y.S.2d 895 (1978) (while equities not such as to justify estoppel, detrimental reliance on zoning actions may be used to show unnecessary hardship); *Reichenbach v. Windward at Southampton*, 80 Misc.2d 1031, 364 N.Y.S.2d 283 (1975) (building inspector's successive grants of illegal use variances did not constitute basis for estoppel, but expenditures in reliance thereon could be considered as unnecessary hardship).

Even after an applicant has demonstrated uniqueness and undue hardship, applicant must still show the third element of the variance test, namely, that the variance will not harm the public or undermine the zone plan. *Jayne Estates, Inc., supra*, 22 N.Y.2d at 422, 239 N.E.2d at 715, 293 N.Y. S.2d at 79 (possible damage to zone plan if owner is allowed to proceed under vested rights based on a mistake of zoning authorities; whereas, in seeking a variance, owner must show both that he cannot recover his investment *plus* that his proposed use will

not be inconsistent with the zoning scheme). Here, the BZA found that the proposed addition would not have a detrimental impact on the neighborhood or the zone plan. Petitioner asks this court to find that the Board's conclusion was faulty.

Our inquiry is limited to whether findings are supported by reliable, probative and substantial evidence in the record as a whole, and whether the Board's conclusions flow rationally from these findings. *Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Commission*, D.C.App., 403 A.2d 737 (1979); *Stewart v. Board of Zoning Adjustment*, D.C.App., 305 A.2d 516 (1973). The Board's conclusion was amply supported by the record. It flows logically from several findings of fact, for instance, that the hours and functions of the building would remain the same, that no new employees would be brought into the neighborhood, that the Metro across the street would alleviate congestion, and that the structure would be compatible with the design and height of surrounding buildings. Consequently, we conclude that the Board's decision is supported by substantial evidence and was neither arbitrary nor capricious.

Petitioner's final claim is that the Board violated its own rules and the District of Columbia Administrative Procedure Act by receiving intervenors' proposed order after the record was closed and issuing findings of fact and conclusions of law almost identical to those intervenors submitted. Moreover, the proposed order was never served on petitioner. Petitioner maintains that this violation amounted to a denial of due process in that he had no opportunity to submit rebuttal evidence or his own proposed order. Even though we strongly support the fundamental judicial principle "that the mind of the decider should not be swayed by materials which are not communicated to both parties and which they are not given an opportunity to controvert," *Mazza v. Cavicchia*, 15 N.J. 498, 516, 105 A.2d 545, 555 (1954), quoted

with approval in *Citizens Association of Georgetown v. D.C. Alcoholic Beverage Control Board*, D.C.App., 288 A.2d 666, 669 (1972), we must nevertheless rule against petitioner on this point.[9]

BZA Supplemental Rules of Practice & Procedure § 4.71 provides that "[p]arties to the [BZA] proceeding may submit proposed findings of fact and conclusions of law for the consideration of the Board within such time as the presiding officer may direct." Intervenors were proceeding in accordance with this rule. Petitioner was free to submit his own proposed findings of fact and order under the same rule. The rule implies that the proposed findings are for the consideration of the Board, not the other parties. As this court said about a substantially identical portion of the zoning regulations, "[W]e are unable to find anything in Title 20 of the D.C.Rules and Regulations requiring the proposed findings to be served upon other parties." *Dupont Circle Citizens Association v. District of Columbia Board of Zoning Adjustment*, D.C.App., 355 A.2d 550, 555 (1976). Nor does the submission of proposed findings after the record is closed violate the District of Columbia Administrative Procedure Act. D.C.Code 1973, § 1–1509(b), requires that every party be given the right to be present, submit rebuttal evidence, and cross-examine at contested case proceedings. Petitioner took advantage of this right during the hearing itself.

In support of his position petitioner cites three cases that stand for the proposition that an administrative tribunal violates due process when it considers matters which a party had no opportunity to rebut. *Gonzales v. United States*, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955) (Justice Department's recommendation to Appeal Board to deny conscientious objector status violated due process because registrant had no opportunity to rebut the adverse evidence contained in Justice Department's report); *Market Street Railway v. Railroad Commission of California*, 324 U.S. 548, 65 S.Ct. 770,

89 L.Ed. 1171 (1945) (due process was observed when the company had notice its rates were under attack, there was evidence in the record to support the Commission's conclusions, and the additional matters outside the record which the Commission noticed were merely cumulative); *Quick v. Department of Motor Vehicles*, D.C.App., 331 A.2d 319 (1975) (error for examiner to consult petitioner's traffic record without notice so as to allow petitioner no opportunity to rebut inaccuracies). All three cases refer to a situation where the Board considers *evidence* which is not properly admitted into the record so that a party has no opportunity to challenge its worth. Here, the material submitted to the Board was not evidence, but rather conclusions which might be drawn from the evidence already included in the record.

Due process considerations differ with respect to evidence in the record and proposed findings of fact and conclusions of law, as is shown by a number of challenges under Federal Rule of Civil Procedure 52(a) (in nonjury cases, court shall prepare findings of fact and conclusions of law). Courts have often decided who will win the suit, directed that party to submit findings of fact and conclusions of law, and then adopted those findings as its own. *See* J. Skelly Wright, *The Nonjury Trial—Preparing Findings of Fact and Conclusions of Law, Seminars for Newly Appointed U.S. District Judges*, 159, 166 (West 1963). In effect, one counsel loses the opportunity for comment on the other party's proposed findings, even if they are served on him according to Federal Rule of Civil Procedure 5.

 Although reviewing courts have frowned on this procedure, they have nevertheless held that the findings cannot be rejected out of hand on due process grounds. Such findings will be examined narrowly to see if they are supported by evidence in the record, but if supported, they will stand. *See United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 84 S.Ct.

---

**9.** No reason appears why the Board of Zoning Adjustment should not follow the invariable practice of serving all filed papers upon each party to the adjudication, and we suggest that the Board do so in future.

1044, 12 L.Ed.2d 12 (1964); *United States v. Crescent Amusement Co.,* 323 U.S. 173, 184–85, 65 S.Ct. 254, 89 L.Ed. 160 (1944); *Shlensky v. Dorsey,* 574 F.2d 131, 148–49 (3d Cir. 1978); *George W. Bennett Bryson & Co. v. Norton Lilly & Co.,* 502 F.2d 1045, 1049 (5th Cir. 1974). *But see Roberts v. Ross,* 344 F.2d 747 (3d Cir. 1965) (court strongly disapproves the practice); *United States v. Forness,* 125 F.2d 928, 942–43 (2d Cir. 1942) (facts and conclusions prepared by one counsel were inconsistent with the opinion, thus creating clear error). We have already noted the ample evidence in this record which supports the BZA's grant of a variance to intervenors and therefore we hold that due process was observed even though the Board incorporated findings and conclusions prepared by intervenors and not served on petitioner.

■■ In conclusion, variance law is broad enough to relieve in some instances the strict application of the zoning regulations in cases where the applicant's unique situation and undue hardship have been caused by good faith reliance on previous assurances of the zoning authorities. While the authorities' actions may not be sufficient to warrant application· of estoppel, their actions may be considered under variance law which is designed to avoid harsh and unjust results in extraordinary situations like the present one. Under variance law, the neighborhood will be protected despite former laxity of zoning officials, because the third variance test must still be met, namely, the zone plan must not be undermined and the public must not be harmed. There was ample evidence in the record of this case to support the BZA's conclusion that the variance does not harm the public interest. Accordingly we affirm.

*Affirmed.*