James T. DRAUDE, Phyllis Levine, Michele Bouquet, and Luzmila Cofre, Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,

George Washington University, Intervenor.

No. 88–264.

District of Columbia Court of Appeals.

Argued Nov. 21, 1989.

Decided Nov. 29, 1990.

James T. Draude, for petitioners.

Norman M. Glasgow, with whom C. Francis Murphy and Louis P. Robbins were on the brief, for intervenor.

Frederick D. Cooke, Jr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, filed a statement in lieu of brief on behalf of respondent.

Before TERRY, SCHWELB and FARRELL, Associate Judges.

TERRY, Associate Judge:

Petitioners seek review of an order by the Board of Zoning Adjustment (BZA) granting the application of George Washington University (GWU) for three special exceptions and three variances which allowed it to build an extension ("the Addition") to the H.B. Burns Memorial Building at 2150 Pennsylvania Avenue, N.W. Petitioners, four owner-residents of condominium units in an apartment building next door to the Addition, make six claims of error. They contend (1) that the BZA erred when it granted GWU a special exception to alter its campus plan; (2) that the BZA erred when it granted GWU a variance to build the Addition because the Addition extended the non-conforming floor area ratio (FAR) of the Burns Building; (3) that the BZA erred when it granted a special exception allowing the Addition to exceed a 3.5 FAR; (4) that the BZA erred when it granted GWU a special exception allowing a non-conforming roof structure; (5) that the BZA erred when it granted GWU variances allowing a non-conforming open court on the east side of the Addition; and (6) that the BZA's decision-making process was flawed because it did not give sufficient weight to the concerns voiced by the Advisory Neighborhood Commission.

The case is here for the second time. In *Draude v. District of Columbia Board of Zoning Adjustment*, 527 A.2d 1242 (D.C. 1987) (*Draude I*), we reversed the BZA's original decision in favor of GWU and remanded the case for further proceedings. After those proceedings were completed, the BZA ruled again in GWU's favor. Petitioners filed the instant petition for review (*Draude II*), seeking reversal of that ruling. We are satisfied, however, that the several decisions made by the BZA after the remand are supported by both the law and the facts, and that each decision rationally flows from the evidence of record. We

therefore affirm the BZA's order in all respects.[1]

I

In late 1984 GWU developed a plan to build an extension to the H.B. Burns Memorial Building. The Burns Building, located at the southeast corner of Pennsylvania Avenue and 22nd Street, N.W., was principally used at that time to provide faculty offices for the GWU Medical School. The proposed Addition was designed to relieve overcrowding in these offices. GWU also intended to consolidate in it various medical functions spread out among several buildings, both on and off the university campus, so that the Addition might serve as a comprehensive outpatient or ambulatory care facility.

Originally, two designs for the Addition were submitted to the BZA. The second design—the one ultimately approved—called for a structure of 121,923 square feet with eight floors above street level and four floors underground. Of the twelve levels, nine were to be used for medical-related activities and three for underground parking.

The property on which the Addition now stands (see note 1, *supra*) is almost entirely in an R–5–C ("medium-high density" residential) zoning district. The site is long, narrow, and irregular in shape, although generally rectangular. It is bordered by the Burns Building on the north, 22nd Street on the west, I Street on the south, and a restaurant, a public alley, and a condominium apartment building, the President, on the east. Before the construction of the Addition, the southern portion was used by the university as a parking lot. The Addition itself is attached to the Burns Building, which is in a C–3–C ("high-bulk" commercial) zoning district. As a universi-

1. While this case was making its way through the administrative and judicial process, construction began on the Addition. After the BZA made its final ruling, the building was completed and is now fully operational, primarily as an ambulatory care facility.

We mention this only as a historical fact, for it has no effect on our decision. Indeed, if we

were to conclude that the BZA had erred in allowing the Addition to be built, we would not hesitate to order appropriate relief, which might include requiring GWU to make modifications in the Addition or even, conceivably, to tear it down.

ty structure, the Burns Building is located there as of right.[2] However, because its FAR and height exceed prescribed limits for buildings in a C–3–C district, it is a non-conforming structure.[3]

After the BZA issued its first order granting GWU's request for permission to build the Addition, James Draude and other unit owners in the President (hereafter "the Condominium") petitioned this court for review of that decision. Some of the other petitioners withdrew from the case, but Mr. Draude remained an active litigant, filing a brief and presenting oral argument before the court. Our opinion in *Draude I* followed in due course, reversing the BZA's decision and remanding the case for further proceedings. We concluded that a number of the BZA's findings were not adequately supported by the evidence of record. On remand, the BZA readvertised GWU's application for special exceptions and variances. In a "Statement of the Applicant" filed December 2, 1987, GWU outlined the relief it was seeking: (1) a special exception allowing it to change the approved campus master plan by building an extension to the Burns Building;[4] (2) a special exception for permission to exceed a 3.5 FAR on the residentially zoned site;[5] (3) a variance from the open court width requirements;[6] (4) a variance from the prohibition on building an addition to an existing structure with a non-conforming FAR that extends the non-conformity;[7] and (5) a variance from the prohibition on building an addition to an existing non-conforming structure that creates a new non-conformi-

ty (the open court).[8] GWU's statement also included a witness list, an outline of the case in chief to be presented, and a summary of the testimony to be offered. A week later, on December 9, Advisory Neighborhood Commission (ANC) 2–A filed two reports stating its concerns with respect to each of the requested special exceptions and variances. Included in these reports was a recommendation that GWU's application be denied.

On December 16, 1987, the originally scheduled hearing date, the BZA ruled that a proposed roof structure on the Addition could not be built as a matter of right. Consequently, GWU had to resubmit its application and include in it a request for an additional special exception regarding the proposed non-conforming roof structure.[9] Accompanying this request were the full written testimony of GWU's witnesses, supporting exhibits, and proposed findings of fact and conclusions of law, all of which were entered into the record.

The BZA held a hearing in February 1988 to consider GWU's requests in light of our decision in *Draude I.* In support of its requests, GWU offered the testimony of several experts to help resolve contested issues.[10] In all, fifteen witnesses testified. The District of Columbia Office of Planning also supported the application, both at the hearing and in written reports. After both sides submitted proposed findings of fact and conclusions of law, the BZA issued a lengthy order on February 25 granting GWU's application.[11] In doing so, it ap-

---

**2.** *See* 11 DCMR §§ 701.6(f), 721.1, 741.1 (1987).

**3.** The Burns Building is 124.5 feet high, and its gross floor area is 80,585.5 square feet, yielding a FAR of 9.47. The maximum permissible height in a C–3–C district, however, is 90 feet, and the maximum permissible FAR is 6.5. *See* 11 DCMR §§ 770.1, 771.2 (1987).

**4.** *See* 11 DCMR § 210 (1987).

**5.** *See* 11 DCMR § 210.3 (1987).

**6.** *See* 11 DCMR § 406.1 (1987).

**7.** *See* 11 DCMR § 2001.3(c) (1987).

**8.** *See* 11 DCMR § 2001.3(c) (1987).

**9.** *See* 11 DCMR §§ 400.8, 770.7 (1987).

**10.** GWU's witnesses included Dr. L. Thompson Bowles, Acting Vice President for Medical Affairs, Dean for Academic Affairs, and Professor of Surgery at the GWU Medical Center; Charles E. Diehl, Vice President and Treasurer of GWU; E.M. Knowles, Jr., a health care planning consultant and National Director of Facilities Planning for Hamilton/KSA; Avery C. Faulkner, an architect and specialist in the design of health care buildings; William S. Harps, an expert real estate appraiser; and John F. Callow, an expert traffic consultant.

**11.** The BZA's order consisted of two sections of separately numbered paragraphs entitled "Findings of Fact" and "Conclusions of Law," which

proved the three special exceptions and the three variances requested by the University.

The Addition has now been built. It stands just west of the Condominium, an eight-story residential building with seventeen one-bedroom units and 108 efficiencies. The lower portion of the west wall of the Condominium, which faces the Addition, contains only small windows which serve bathrooms, kitchens, and closets. The upper portion of the west wall, which is stepped back, contains windows serving the living areas of forty-eight residential units. Whereas the roof of the Condominium is eighty feet above street level, the east wall of the Addition—which faces the Condominium—rises 118.5 feet above the ground, including the penthouse structures. Although the Addition has a FAR in excess of that permitted by the zoning regulations, it does conform to applicable height limits.[12]

Petitioners' arguments as to why the Addition was improperly approved are legion. There are, however, four main contentions: (1) that the Addition is contrary to the intent and purpose of the zoning regulations because extraordinary circumstances, which would justify variances, are not present; (2) that the Addition creates objectionable conditions for the residents of the Condominium and tends to affect adversely the use of their property; (3) that the light and air of the Condominium are adversely affected because the BZA failed to require the normal roof structure setback on the Addition; and (4) that GWU failed to justify the granting of a variance for a substandard open court on the east side of the Addition.

## II

■ The questions that now confront us are whether the final decision of the BZA comports with applicable zoning statutes and regulations, and whether it is supported by case law and the evidence of record. We must uphold decisions made by the BZA if they rationally flow from findings of fact supported by substantial evidence in the record as a whole. *Foxhall Community Citizens Ass'n v. District of Columbia Board of Zoning Adjustment,* 524 A.2d 759, 761 (D.C.1987); *George Washington University v. District of Columbia Board of Zoning Adjustment,* 429 A.2d 1342, 1345 (D.C.1981); *Citizens Ass'n of Georgetown v. District of Columbia Zoning Commission,* 402 A.2d 36, 41–42 (D.C.1979); *see* D.C.Code §§ 1–1509(e), 1–1510(a)(3)(E) (1987). As we said in *Citizens Ass'n of Georgetown,* "when the findings of basic facts are each supported by sufficient evidence and, when taken together, rationally lead to conclusions of law and an agency decision consistent with the governing statute, we shall affirm that decision." 402 A.2d at 47. This is also the message of *Draude I,* which examined the petitioner's objections to the BZA's earlier order of December 20, 1985, and painstakingly pointed out where the BZA had failed to meet its responsibilities.

■ Our review must also consider whether the findings made by the BZA are sufficiently detailed and comprehensive to permit meaningful judicial review of its decision. *A.L.W., Inc. v. District of Columbia Board of Zoning Adjustment,* 338 A.2d 428, 430 (D.C.1975). "Generalized, conclusory, or incomplete findings are not sufficient." *Dietrich v. District of Columbia Board of Zoning Adjustment,* 293 A.2d 470, 473 (D.C.1972). Furthermore, the BZA must give "great weight" to the issues and concerns raised by the ANC, D.C.Code § 1–261(d) (1987), although "it is not obliged to follow the ANC's recommendations or adopt its views." *Upper Georgia Avenue Planning Committee v. Alcoholic Beverage Control Board,* 500 A.2d 987, 993 (D.C.1985) (citations omitted). Taking all of these factors into account, we affirm the BZA's final decision.

A. The Special Exception Allowing GWU to Alter Its Campus Plan

■ The BZA's order states that GWU "qualifies as a university under the Zoning

---

we shall cite as "BZA FF" and "BZA CL," respectively.

**12.** *See* 11 DCMR §§ 400.1, 402.4 (1987).

Regulations, and the Campus Plan approved by the Board in 1970 ... governs its development." BZA FF ¶ 3. The original campus plan [13] did not specifically provide for an extension to the Burns Building; consequently, GWU first had to obtain a special exception [14] to permit a change in its campus plan. The BZA's order recognized the need for a special exception and found justification for it:

> The proposed Addition is located within an area of the approved 1970 Campus Plan designated "Medical School–Hospital." This use has been expressed in the Plan since at least 1970. GWU owned slightly over half of the site when the 1970 Plan was approved. Thereafter, it acquired the remainder. Further, the Illustrative Site Plan shows this site for an extended medical care center. Ambulatory care services are similar to the intent of the Illustrative Site Plan. Emphasis on short hospital stays has replaced the extended medical care centers. Thus, the spirit of flexibility provided in the Plan fits well with the proposed use. The Board notes that, as stated in the approved 1970 plan:
>
>> The Campus Plan must, like a city plan, be expressed in terms of policies. A plan only in terms of specific building projects would be of limited value.... Therefore, the campus plan itself is in terms of locational and design policies.
>
> The Board finds that the proposed Addition is consistent with what is shown on the 1970 campus master plan. The 1985 Campus Plan contains no amendments which would materially affect this finding.

BZA FF ¶ 25. This decision is consistent with the testimony and with an analysis of the original campus plan and its subsequent amendments. Although petitioners argue at length that the Addition might have been located elsewhere and that it is barely adequate as an ambulatory care center, they offer no persuasive reasons why the Addition is inconsistent with the campus plan. Thus there is no articulable argument that either the 1970 campus plan or the relevant regulation, 11 DCMR § 210, is incompatible with the Addition. Furthermore, the excerpt from the BZA's order which we have just quoted shows that this issue was specifically considered. We hold that the BZA's decision to grant this exception is consistent with the governing regulation and is supported by substantial evidence.

## B. The Variance Allowing GWU to Build an Addition Extending the Non–Conforming FAR of the Burns Building

The FAR of the Burns Building makes it a non-conforming structure, so that any addition to it would be subject to the restrictions of 11 DCMR § 2001.3(c) (1987):

> Enlargements or additions may be made to the structure; Provided, that the following requirements shall be met:
>
> *    *    *    *    *    *
>
> (c) The addition or enlargement itself shall not increase or extend any existing nonconforming aspect of the structure, and shall not create any new nonconformity of structure and addition combined.

Because the Addition would increase what is already a nonconforming FAR, GWU could not build the Addition without a variance. To obtain one, GWU was required to show—and did show to the BZA's satisfaction—that strict application of the zoning regulations would result in extraordinary and exceptional practical difficulties, and that the proposed non-conformity would not be detrimental to the public good, nor

---

**13.** 11 DCMR § 210.4 (1987), which governs university development, states:

> The [university] shall submit to the Board a plan for developing the campus as a whole, showing the location, height, and bulk, where appropriate, of all present and proposed improvements....

**14.** 11 DCMR § 3108.1 (1987) authorizes the BZA "to grant special exceptions ... where, in the judgment of the Board, those special exceptions will be in harmony with the general purpose and intent of the Zoning Regulations and Maps and will not tend to affect adversely the use of neighboring property in accordance with the Zoning Regulations and Zoning Maps...."

would it substantially impair the intent, purpose, and integrity of the already approved zoning scheme. *See* D.C.Code § 5–424(g)(3) (1988).[15] Petitioners contest the BZA's ruling on this point in favor of GWU. We find no error in the granting of this variance.

### 1. *Extraordinary Conditions Justify This Particular Variance*

Petitioners argue that the BZA should not have approved a variance that increased what was already a non-conforming FAR. In support of their argument, they note that the 1970 campus plan designated a site for medical facility expansion ("Square 40") and that the principal reason for adding to the Burns Building instead of building on Square 40 was financial. For an additional $12,000,000, they maintain, GWU could have used Square 40 to build a structure comparable to the Addition. Petitioners contend that "[t]he BZA is not authorized to grant an area variance merely to avoid the added expense or inconvenience inherent in alternative methods of construction or merely to allow the most profitable use of the land." Their argument, in essence, is that financial considerations do not give rise to extraordinary or exceptional circumstances justifying a variance. Even assuming the correctness of this argument, we reject it—as did the BZA—because it does not apply to this case, which involves much more than "added expense or inconvenience" or an attempt to make "the most profitable use of the land."

The BZA stated in its order:

[T]he Board concludes that the irregular shape of the lot, the narrowness of its southern portion, and the pre-existing Burns Building constitute an extraordinary or exceptional situation or condition of the subject site, and that strict application of Subsections 506.1 and 2001.3(c) would result in peculiar and exceptional difficulties to or exceptional and undue hardship upon the owner.

BZA CL ¶ 17. The first factor considered by the BZA was the irregularity of the site upon which the Addition is built. Although petitioners dismiss this factor without comment, it was specifically addressed in the testimony before the BZA.[16] Thus there is support in the record for the conclusion that the nature of the site itself serves to justify the variance. Even more important is the proximity of the Burns Building, as the BZA recognized:

The Board concludes that it is an institutional necessity for GWU to expand its ambulatory health care facilities and that such expansion requires that the Addition be physically linked to and interconnected with the Burns Building. This, in turn, requires that a portion of the Addition be constructed on the C–3–C portion of the site, thereby requiring the granting of this variance.

BZA CL ¶ 20. This conclusion logically follows from paragraph 35 of the BZA's factual findings:

GWU was required to use this particular site for an addition to the Burns Building for a variety of reasons. First, this site allows GWU to continue to use the valuable asset of the pre-existing Burns Building, which is already devoted to ambulatory care. Second, a successful ambulatory care center requires proximity to the hospital, due to the extensive interaction between the medical staff and

---

**15.** Section 5–424(g)(3) empowers the BZA to grant a variance from the "strict application" of the zoning laws on a showing that "by reason of exceptional narrowness, shallowness, or shape ... or other extraordinary or exceptional situation or condition of a specific piece of property, the strict application of any [zoning] regulation ... would result in peculiar and exceptional practical difficulties to or exceptional and undue hardship upon the owner of the property," provided that the variance can be granted "without substantial detriment to the public good and without substantially impairing the intent, pur-

pose, and integrity of the zone plan as embodied in the zoning regulations and map...." The entire text of section 5–424(g)(3) is reproduced verbatim in the relevant regulation, 11 DCMR § 3107.2 (1987).

**16.** For example, Mr. Faulkner stated that the narrowness of the site made it difficult to design an adequate outpatient care facility there. He also pointed out that the site grade rises one full story from the south end at I Street to the north end at Pennsylvania Avenue.

the hospital. Third, any new addition must comply with the George Washington University Campus Plan. Fourth, the expansion of the Burns Building on the subject site is the only economically feasible location for the required consolidated ambulatory care facility. Granted, Square 40 is also in reasonable proximity to the Hospital and is identified for that reason as the site for further medical facilities. However, it would be unreasonable to require GWU to convert a valuable resource, that is, the existing Burns Building, to other medical, or to other than medical, use at this time, in order to locate a comparable ambulatory care facility on Square 40.

BZA FF ¶ 35. Again, these findings are supported by the evidence of record. Through the testimony of Charles Diehl, its Vice President and Treasurer, GWU demonstrated that it could not expand and consolidate its inadequate outpatient facilities unless it could build an Addition to the Burns Building. Furthermore, Mr. Diehl explained that the use of Square 40 for the Addition had in fact been considered; it was rejected, however, not only for fiscal reasons, but because it was "reserved for a future hospital as a possible site." [17]

In *Clerics of Saint Viator, Inc. v. District of Columbia Board of Zoning Adjustment*, 320 A.2d 291 (D.C.1974), we considered whether the reasons for granting a variance must be related to the characteristics of the land itself. We declined to establish such a requirement, stating that the BZA "is in error when it takes the position that a variance may only be issued when the required hardship inheres in 'land' as opposed to 'property.'" *Id.* at 294. In the case at bar, the existence and purpose of the Burns Building qualifies as

an "extraordinary or exceptional situation or condition" justifying the variance. While we reject any suggestion that added expense alone would entitle a property owner to a variance, *see Barbour v. District of Columbia Board of Zoning Adjustment*, 358 A.2d 326, 327 (D.C.1976), other significant factors are present in this case. The shape of the property, the proximity of the Burns Building, and the inadequacy of Square 40, taken together, support the BZA's conclusion that a variance is warranted. Furthermore, GWU presented evidence indicating that unless the Addition was built as an extension to the Burns Building, it could not undertake the project at all. In this particular context, the added expense may properly be deemed a factor, to be weighed along with all the other factors, in deciding whether to grant a variance.[18] Finally, as we said in *Monaco v. District of Columbia Board of Zoning Adjustment:*

> [W]hen a public service has inadequate facilities and applies for a variance to expand into an adjacent area in common ownership which has long been regarded as part of the same site, then the Board of Zoning Adjustment does not err in considering the needs of the organization as possible "other extraordinary and exceptional situation or condition of a particular piece of property."

407 A.2d 1091, 1099 (D.C.1979). For all of these reasons, we affirm the BZA's decision to grant this particular variance as justified on the ground of exceptional circumstances.

2. *The Addition Is Not Detrimental to the Public Good*

■ Although much of the BZA's order is devoted to showing that the Addition serves the public interest by enhancing the

---

**17.** Other witnesses testified that it was necessary to link the Burns Building to the expanded ambulatory care facility. Mr. Knowles, a health care planning consultant, emphasized the need for a centralized facility. He also testified that such a facility could not be made smaller or rearranged without adverse impact upon its operation. Dr. Bowles, GWU's Acting Vice President for Medical Affairs, also stressed the need for proximity between the Burns Building and the new facility.

**18.** We recently observed in *Gilmartin v. District of Columbia Board of Zoning Adjustment*, 579 A.2d 1164, 1171 (D.C.1990), that "at some point" economic harm may become sufficient to justify a variance, "at least when coupled with a significant limitation on the utility of the structure." *Gilmartin* makes clear that it is for the BZA, in the first instance, to determine whether such a limitation is "significant."

quality of health care services in the District of Columbia, petitioners argue that the variance flouts sound public policy and is therefore detrimental to "the public good," as that term is used in D.C.Code § 5–424(g)(3) and 11 DCMR § 3107.2.[19] Specifically, they contend that the BZA should protect and enhance the quality of existing residential property in the District of Columbia, and that it failed to live up to this obligation when it granted the variance. The reasoning behind this argument confuses the "public good" with the more narrow interests of the Condominium and its unit owners; what is beneficial to them, singly or as a group, is not necessarily synonymous with the public good. This does not mean, of course, that petitioners' interests are to be discounted; on the contrary, they must be fully considered by the BZA. It does mean, however, that to win reversal of the BZA's decision on this ground, petitioners must convincingly show that the enhanced outpatient care facilities provided by GWU will be detrimental to the public good. In their brief petitioners go so far as to say that "[t]he neighboring owners did not dispute that ambulatory health care services benefit the public good." Given this statement, the BZA's extensive factual findings regarding the beneficial nature of the Addition, and the evidence of record, it is clear to us that petitioners have not carried their burden of persuasion. Indeed, the BZA concluded as a matter of law that "[t]he granting of this variance will benefit the public good" (BZA CL ¶ 20). We have no reason to overturn that conclusion.

The possibility that the Addition may benefit the public and yet be unacceptable to its neighbors presents different issues. The questions of whether the Addition's impact on light and air, traffic patterns, and real estate values may have an adverse effect on the use of neighboring property—all very important in the analysis of whether the variances and special exceptions were properly granted—are discussed later

in this opinion. Here, however, we need only say that we agree with the BZA's conclusion that the granting of this variance will benefit the public good and that petitioners' assertion to the contrary is unpersuasive.

3. *The Addition Does Not Impair the Intent and Purpose of the Zoning Plan*

■ Petitioners argue that "[a]n addition that more than doubles the size of an existing non-conforming structure not only substantially impairs the intent and purpose of the Zoning Regulations regarding non-conforming structures but completely vitiates that intent and purpose." To buttress their argument, petitioners point out that one established purpose of zoning regulations, widely recognized and upheld by the courts, is the gradual elimination of nonconforming structures. *See Lenkin v. District of Columbia Board of Zoning Adjustment*, 428 A.2d 356, 358 (D.C.1981). This argument, however, ignores the very purpose of special exception and variance relief. As we explained in *Palmer v. District of Columbia Board of Zoning Adjustment*, 287 A.2d 535, 541 (D.C.1972), the variance procedure is "designed to provide relief from the strict letter" of the zoning regulations. Given the shortage of substantive reasons for their contention that this variance impairs the intent of the zoning plan, petitioners' argument is tantamount to saying that variances should not be granted. That simply is not the law. Even the two cases on which petitioners rely [20] do not support their argument, for those cases expressly recognize that the BZA is empowered to grant variances from non-conforming use and structure regulations, as long as the standards required for each particular variance are met.

C. The Special Exception Allowing the Addition to Exceed FAR Requirements

In granting GWU a special exception from the applicable FAR requirements, the

---

19. See note 15, *supra.*

20. *Lenkin v. District of Columbia Board of Zoning Adjustment, supra; Silverstone v. District of*

*Columbia Board of Zoning Adjustment*, 372 A.2d 1286 (D.C.1977), *opinion amended*, 396 A.2d 992 (1979).

BZA noted that the Addition was "in a highly urban area zoned R–5–C (medium-high density) and designated for institutional use by the Comprehensive Plan,"[21] and concluded that "it is appropriate to exceed the 3.5 FAR at this site. This is consistent with the policy of avoiding campus expansion into low-density districts." BZA CL ¶ 11. Petitioners contend that the BZA erred in so ruling.

In *Draude I* we observed that "colleges and universities may locate in residential districts if, among other requirements, they have an approved campus plan and obtain a special exception." 527 A.2d at 1248. The zoning regulations contain a special rule for colleges and universities, which in *Draude I* we called the "aggregation rule." Under it, the BZA may authorize an exception to the FAR restrictions on a university structure in an R–5–C district as long as "the total bulk of all buildings and structures on the campus shall not exceed the gross floor area prescribed for the R–5–C district." 11 DCMR § 210.3 (1987).

The BZA, however, must also determine that any permitted structure is consistent with the policy of avoiding "unreasonable campus expansion into improved low-density districts,"[22] and that the permitted structure "will not tend to affect adversely the use of neighboring property in accordance with the Zoning Regulations and Zoning Maps...."[23] We made this clear in *Draude I:*

Universities cannot use the corporate FAR as a matter of right in residential zoning districts; they must obtain a special exception under 11 DCMR § 210.3. *See* 11 DCMR § 3108.1 (listing actions requiring special exceptions).⁸ Draude points out that the BZA orders do not address the special exceptions required before GWU can use the FAR aggregation rule in order to build the addition with an FAR substantially in excess of that normally permitted in an R–5–C district. Because we find no reference to this question in the BZA orders under review, the BZA on remand must determine whether such a special exception is justified.

\*       \*       \*       \*       \*       \*

... Thus, before approving a university structure such as the Addition on the basis of the FAR aggregation rule, the BZA must find that the permitted expansion in the structure's bulk (1) is consistent with the policy of avoiding "unreasonable expansion into improved low-density districts" and (2) "will not tend to affect adversely the use of neighboring property."

527 A.2d at 1249. Because the BZA had not made such findings in *Draude I*, we directed it to do so on remand. Now, in *Draude II*, we must determine whether the BZA followed the instructions we gave it in *Draude I*. We conclude that it did, and

---

**21.** As to the Comprehensive Plan, *see generally Tenley & Cleveland Park Emergency Committee v. District of Columbia Board of Zoning Adjustment,* 550 A.2d 331, 335–341 (D.C.1988), *cert. denied,* 489 U.S. 1082, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989).

**22.** 11 DCMR § 210.3 (1987) states:

In R–1, R–2, R–3, R–4, R–5–A, and R–5–B districts, the maximum bulk requirements normally applicable in the districts may be increased for specific buildings or structures; Provided, that the total bulk of all buildings and structures on the campus shall not exceed the gross floor area prescribed for the R–5–B district. In all other residential districts, similar bulk increases may also be permitted; Provided, that the total bulk of all buildings and structures on the campus shall not exceed the gross floor area prescribed for the R–5–C

district. Because of permissive increases as applicable to normal bulk requirements in the low-density districts regulated by this title, it is the intent of this subsection to prevent unreasonable campus expansion into improved low-density districts.

**23.** 11 DCMR § 3108.1 (1987) states:

Pursuant to authority contained in the Zoning Act of June 20, 1938 (52 Stat. 797), as amended, the Board is authorized to grant special exceptions, as provided in this title where, in the judgment of the Board, those special exceptions will be in harmony with the general purpose and intent of the Zoning Regulations and Maps and will not tend to affect adversely the use of neighboring property in accordance with the Zoning Regulations and Zoning Maps, subject in each case to the special conditions specified in this title....

hence we affirm the granting of the special exception to the 3.5 FAR requirement.

### 1. *The Addition Is Consistent with the Policy of Avoiding "Unreasonable Campus Expansion into Improved Low–Density Districts"*

■ In *Draude I* the petitioner argued that the Addition constituted an unreasonable expansion into an improved low-density neighborhood because it would generate unacceptably high levels of traffic. He further maintained that the BZA's finding on traffic impacts was not based on substantial evidence in the record. We accepted these assertions, stating, "We agree that the BZA did not adequately justify its traffic finding...." 527 A.2d at 1250. On remand, however, the BZA received further evidence on this subject. Thereafter, in its final decision, the BZA found (1) that existing levels of traffic would not change as a result of the Addition (BZA FF ¶ 60); (2) that the distribution of traffic would be favorable because the location is convenient to a subway stop (one block away), as well as a major city bus route, and staff would be centralized, thereby creating car-pooling opportunities (BZA FF ¶¶ 16, 61); (3) that after other medical facilities were consolidated in the Addition, rush-hour traffic would increase by only eighty-four vehicles, which would not change the operational levels of service on I Street, 22nd Street, and Pennsylvania Avenue (BZA FF ¶ 62); (4) that vehicles entering the Addition's parking garage on I Street would present no safety problems or significant traffic congestion (BZA FF ¶¶ 63, 64); [24] (5) that the Addition would not increase the number of university students (BZA FF ¶ 65); (6) that it would have "a negligible impact on the adjacent street system" (BZA FF ¶ 67); (7) that it would have adequate loading facilities (BZA FF ¶ 80); and (8) that it would not have an adverse impact on parking (BZA FF ¶¶ 54, 75). One of the Board's conclusions of law was that "the Addition will not have an adverse impact on the traffic, because the levels of service will not be adversely affected and will remain in the current favorable condition." BZA CL ¶ 8.

The BZA made these findings after considering written submissions and testimony by representatives of the Office of Planning and after hearing the testimony of John Callow, GWU's traffic consultant. Mr. Callow spoke at length, produced exhibits, and was subject to thorough cross-examination. The BZA's detailed findings, supported by ample evidence in the record, convince us that it faithfully followed our instructions in *Draude I.*

The BZA also addressed other issues that might perhaps indicate unreasonable expansion. For example, the Board made a factual finding that a trash compactor would be located adjacent to the loading dock (BZA FF ¶ 81). [25] The BZA also found that the Addition had been designed to minimize any noise impact on the Condominium, stating that "[t]he Addition is not a noise intensive use and does [not] create objectionable noise conditions" (BZA CL ¶ 10). Finally, it noted that landscaping would be coordinated with GWU's overall campus landscape plan and would not conflict with the District's requirements for types, sizes, and locations of plant material (BZA FF ¶ 41). Even the roof covering the

---

24. The BZA's findings reflect its thorough analysis of the traffic safety issue. It stated in FF ¶ 63:

> No safety problems will be caused by vehicles entering the Addition's parking garage. Approximately 84 vehicles will enter the garage during the A.M. peak hour. The pedestrian traffic in the morning hours is projected at roughly 412 persons between 8:30 and 9:30 A.M. This pedestrian movement represents seven persons per minute. The estimated 84 vehicles generated in the A.M. peak hour by the garage represents 1.4 vehicles per minute. The interaction of these numbers of vehicles and pedestrians poses no safety problems. Even if 140 vehicles, the garage's capacity, entered during this period, the result would be 2.33 vehicles per minute, which the Board finds would not create a safety problem. At a typical downtown garage, 5 vehicles per minute enter the garage.

25. The trash compactor, however, would replace one already on the site, and the design of the Addition called for the compactor to be shielded from the Condominium's view. Furthermore, it would not increase already existing noise levels.

garage ramp would be landscaped (BZA FF ¶ 52).

### 2. The Addition Will Not Have an Adverse Impact on the Use of Neighboring Property

On the question of whether the Addition would "tend to affect adversely the use of neighboring property," 11 DCMR § 3108.1 (1987), one of the issues which prompted a remand in *Draude I*, petitioners contend that the Addition will deprive the Condominium of sufficient light and air. We shall address this issue hereafter in part D of this opinion, and hence we do not discuss it here.

■ There are, however, two additional matters that fall under the heading of adverse impact: noise and resale value. The former, although discussed in the BZA's findings of fact,[26] does not appear to concern petitioners, but the resale value of the condominium units is very much at issue. Petitioners contend that "the Addition adversely affects the value of units on the west side of the Condominium because units looking at a blank wall with sunlight blocked are less attractive and bring lower prices." One of the owners testified that the Addition has already made units on the west side of the Condominium more difficult to rent.

At the hearing on remand, GWU presented testimony on resale value from William S. Harps, an expert real estate appraiser. A representative of the unit owners, petitioner Draude, also testified. After weighing their testimony, the BZA found:

> The Addition will have no adverse effect on the fair market value of units in the President Condominium. Based upon the totality of the evidence about sales, including Mr. Draude's testimony in particular, the Board finds that the value of the units in the President which would hypothetically appear most likely to be affected by the Addition has not been adversely affected by the construction of the Addition....

BZA FF ¶ 83. Because this finding is based on extensive testimony, we have no reason to second-guess the BZA's decision on this point. Furthermore, although we strongly encourage the articulation of reasons, *see, e.g., Harris v. District of Columbia Human Rights Commission*, 562 A.2d 625, 631–632 (D.C.1989), we have repeatedly held that an administrative agency "is not legally required to explain ... why it favored one witness or one statistic over another." *Citizens Ass'n of Georgetown, supra*, 402 A.2d at 47 (footnote omitted).

### D. The Special Exception Allowing the Non–Conforming Roof Structures

■ The structures on the roof of the Addition are non-conforming because they do not meet setback requirements, because not all the penthouses and mechanical equipment are placed in one enclosure, and because the walls are of unequal heights. Petitioners argue that the special exception allowing GWU to place non-conforming structures on top of the Addition should not have been granted because they have an adverse impact on the light and air of the Condominium. The importance of this issue was recognized in *Draude I*, where we said that "[o]n remand, the BZA should re-evaluate the significance it must accord the Addition's effect on light and air to the condominium." 527 A.2d at 1251–1252. Here again, the record of the remand proceedings demonstrates to our satisfaction that the BZA properly evaluated the effect of the Addition on the Condominium's light and air, and that its final decision on this point "rationally flow[s] from findings of fact supported by substantial evidence in the record as a whole." *Id.* at 1250 (citations omitted). For example, the BZA found that the condominium units facing the Addition "do not fail to benefit from a reasonable level of direct and reflected light" (BZA FF ¶ 45). In its conclusions of law, the BZA said:

---

26. Concerning traffic noise, the BZA found that the roof over the garage ramp would minimize the noise from vehicles entering and leaving the parking garage, which is completely enclosed.

"Overall," the BZA found, noise from the Addition would be "less than presently generated by the vehicles which use the surface parking lot." BZA FF ¶¶ 51, 53.

[T]he Board concludes that the roof structure will not adversely affect the light and air of adjacent property, will not materially impair the intent and purpose of the Regulations and it is not likely to become objectionable to the neighboring property.

BZA CL ¶ 13. The question before us is whether there was enough evidence on the record to enable the BZA to make this pronouncement.

Avery Faulkner, GWU's architect, testified at the remand hearing on matters pertinent to light and air. He explained that there is a significant difference between direct sunlight and reflected light, and that "direct light can penetrate the passageway between [the] buildings and reflected light exists between both buildings." He also illustrated and augmented his testimony with a number of exhibits. Mr. Faulkner noted, in addition, that the light-colored materials used in the construction of both the Addition and the Condominium are conducive to maximizing reflected light, and that GWU could build a matter-of-right building that would "block all light on the portions of the Condominium closest to I Street and [would] narrow the passageway between the buildings and reduce reflected light available to the habitable rooms of the Condominium." [27] Overall, Mr. Faulkner concluded that, because of the penetration of direct sunlight between the buildings and the color of the building materials, there would be no adverse impact on the reflected light available to the Condominium.

Our decision in *Draude I* also stated that when a public service organization applies for a variance, it must show (1) that the specific design of the building it proposes to build is an institutional necessity, not merely the most desirable of various options, and (2) precisely how the needed design features require the specific variance sought. 527 A.2d at 1256. These points were addressed by the BZA in its findings:

The penthouse will house critical major mechanical equipment for the addition, as well as the emergency power and the central cooling tower and associated equipment for the complex. It has been designed so that the equipment is within the smallest envelope which the building codes allow. Some equipment which is normally placed in a penthouse was moved to mechanical rooms on each floor below the penthouse due to space restrictions. This resulted in a loss of clinical space. No further transfers could reasonably be made. Due to the required equipment and the elevation differential between the Burns Building and the Addition, two separate penthouses are required. Due to the required equipment, the walls of the Addition penthouse cannot match the lower height of the Burns Building penthouse. The same constraints require a special exception from the setback requirements for roof structures.

BZA FF ¶ 42. This finding of fact is supported by the evidence. For example, Mr. Faulkner testified:

I can assure the Board that every engineering effort was made to compress this equipment into the smallest envelope which building codes allow.... Some of the equipment normally found in the penthouse in buildings of this type was moved to mechanical rooms on each floor below the penthouse. This move sacrificed valuable clinic space and no further equipment transfers could be made.

---

27. This last observation was reflected in the BZA's findings. The BZA noted that if the Addition and the Condominium were parts of a single building, the zoning regulations would permit the courtyard between them to be less than 30 feet wide. "In fact, the width of the open space between the Addition and the habitable rooms of the Condominium is well in excess of the width of [the] court which would be required, *to wit*, 36 feet. The Addition, as designed, will exceed the standards in the [regulations] for the provision of light and air by open courts. The Board is mindful that the [regulations] set higher standards for buildings which are on separate lots, but it would be unreasonable to evaluate the Addition's impact without considering standards which the Zoning Commission has found to be reasonable in other circumstances which are significantly similar to those which are before the Board." BZA FF ¶ 48.

Because the mechanical equipment contained in the penthouse structures is integral to the purpose of the Addition, and because this particular exception is required by the purpose of the building, this court will not overturn the BZA's finding. We hold that the decision to permit a nonconforming roof structure is supported by substantial evidence—namely, Mr. Faulkner's testimony—and must therefore be affirmed.

### E. The Variances Allowing the Non-Conforming Open Court on the East Side of the Addition

#### 1. The Open Court Requirements

If strictly applied, 11 DCMR § 406.1 (1987) would require the open court between the Addition and the Condominium to be slightly more than twenty-nine feet wide. Because its actual width is only twenty-one feet, the eight-foot difference made it necessary for GWU to seek a variance. Just as with the variance from FAR requirements, GWU was required to show (1) that strict application of the zoning regulations would result in peculiar and exceptional practical difficulties for the owner, and (2) that the variance would not result in substantial detriment to the public good, nor would it impair the intent, purpose, and integrity of the established zoning plan. D.C.Code § 5–424(g)(3) (1988); 11 DCMR § 3107.2 (1987). In *Draude I* we concluded that when the BZA first granted a variance from open court width requirements, its order did not state "precise or detailed reasons for concluding that conditions exist justifying a variance for the non-conforming open court." 527 A.2d at 1254. The BZA's final order, however, cures these deficiencies and supports the granting of a variance.

First, we are satisfied that both the proximity to the Burns Building and the irregular dimensions of the site satisfy the "extraordinary or exceptional condition" requirement of D.C.Code § 5–424(g)(3). The width of the lot upon which the Addition is built, measured from west to east, ranges from 57 feet at the north end to 100 feet in the middle to 82 feet at the south end. *See Draude I, supra,* 527 A.2d at 1255. In order to build a useful structure, efficient use of space was an absolute necessity. The narrowness and the odd shape of the lot are exceptional conditions in that, as the BZA found, the function of the Addition would have been seriously impaired if a variance were not granted.

The evidence supports the BZA's finding that strict application of the regulations regarding open courts would result in peculiar and exceptional practical difficulties for GWU. In its order the BZA stated:

> The wall [of the Addition] was moved to the maximum extent possible without serious and significant loss of functional space required for the ambulatory care center. The further narrowing of the Addition would have resulted in a building not acceptable for ambulatory health care services. Further narrowing of the building would have resulted in the loss of a substantial number of exam and treatment rooms on each level of the Addition, which rooms could not have been relocated to the front portion of the building.

BZA FF ¶ 50. This finding is supported by the testimony of three of GWU's witnesses, Dr. Bowles, Mr. Knowles, and Mr. Faulkner. For example, Mr. Faulkner, a specialist in the design of health care facilities, stated:

> An ambulatory care building must have a width-to-length ratio which will provide an efficient core and a minimum corridor to serve the patients, physicians and the staff. It is our professional opinion that if the south end of this addition had been made any narrower it would not have been an acceptable building for university medical purposes.

The evidence presented on this issue is particularly important because of our statement in *Draude I* that "[i]f the Board accepts [such testimony] and finds that a conforming open court would *require* significant reductions of floor area, *then a variance may be justified.*" 527 A.2d at 1256 (emphasis added).[28] The testimony on

---

**28.** What prompted our remand with respect to

this point was the fact that the BZA's first order

remand focused on this precise issue. As a result, we decline to disturb the BZA's conclusion that "the irregular shape of the lot, the narrowness of its southern portion, and the pre-existing Burns Building constitute an extraordinary or exceptional situation or condition of the subject site" (BZA CL ¶ 17).

Finally, we agree that the variance is not detrimental to the public good, nor does it impair the intent of the zoning regulations. The width of the court affects only the Condominium. It is significant that the Addition is twenty-one feet from the lower floors of the condominium, and these lower floors do not have rooms generally considered to be "habitable." Upper floors that do have habitable rooms facing the Addition are stepped back fifteen feet from the Condominium's property line, so that the distance between the east wall of the Addition and the parts of the west wall of the Condominium that contain habitable rooms is thirty-six feet. Thus the distance between the walls of the two buildings exceeds—for the most part—the open court width requirements. Furthermore, as discussed in previous sections, the BZA found that the proximity of the Addition would not have an adverse impact on the Condominium. It concluded, rather, "that the granting of these variances will benefit the public interest and good and will not substantially impair the intent, purpose, and integrity of the zone plan as embodied in the Zoning Regulations and Map" (BZA CL ¶ 16). Petitioners have not persuaded us that this conclusion should be overturned.

2. *The Open Court As the Addition of a Non–Conformity to the Already Non–Conforming Burns Building*

■ The pertinent regulation, 11 DCMR § 2001.3(c), prohibits an addition to a non-conforming structure that creates a new non-conformity, but the BZA is authorized to grant a variance if exceptional conditions result in practical difficulties or undue hardship. See note 15, *supra*. We are satisfied, as was the BZA, that these conditions have been met.

Mr. Faulkner testified that without the open court variance, the Addition "would not have been an acceptable building for university medical purposes." This testimony, supported as it was by specific detail, satisfies the "practical difficulties" prong of the test. Furthermore, the open court does not appear to create a substantial detriment to the public good, nor does it impair the intent of the zone plan.[29] The BZA's findings of fact with respect to the Addition's impact on the Condominium, and the testimony supporting these findings, which we have already discussed, speak directly to this issue. Given the record now before us, we find no basis for overturning the open court variance.

F.   Deference to the ANC

■ Finally, petitioners claim that the BZA's decision-making process was flawed because insufficient deference was given to the concerns raised by the ANC. As we have often emphasized, the BZA must give "great weight" to those concerns and must specifically address them "in the written rationale for the governmental decision taken." D.C.Code § 1–261(d) (1971), quoted in *Levy v. District of Columbia Board of Zoning Adjustment,* 570 A.2d 739, 746 (D.C.1990). Here, however, the issues raised by the ANC are—with one exception—identical to those raised by petitioners. Those issues were the subject of written submissions and live testimony. The February 1988 hearing, in particular, demonstrates that the BZA did accord "great weight" to the ANC's positions. The BZA was not required to do more. *Upper Georgia Avenue Planning Committee, supra,* 500 A.2d at 993.

The one issue raised by the ANC and not by petitioners involves the entrance to the underground parking garage. The ANC

---

gave "scant attention to this crucial question and [did] not expressly rely on the evidence of necessity in stating its conclusion that GWU [had] met the requirements for the open court variance." 527 A.2d at 1256.

**29.** We reject petitioners' arguments to the contrary for essentially the reasons set forth in part B–3, *supra*.

maintained that the location of the entrance immediately adjacent to the west wall of the Condominium would generate an unacceptable level of noise and congestion. This point, however, was examined in detail by the BZA. Mr. Callow gave extensive testimony concerning the effect of the Addition on traffic patterns, opining that "[t]he vehicles entering the new Burns garage will not cause congestion on that street [I Street] and will not pose a safety problem for pedestrians." The BZA concluded "that the parking garage ramp cannot feasibly be located on 22nd Street, and that its location on I Street will not tend to affect adversely neighboring property due to traffic, noise, or fumes. There will be no pedestrian conflict with vehicles entering the garage, nor will left-turning vehicles create an objectionable condition due to congestion or conflict with westbound traffic. There will be no objectionable condition due to noise or fumes from the garage or ramp." BZA CL ¶ 9. It is evident to us that the BZA did indeed address the ANC's concerns with particularity, and that the decision to go against the ANC's recommendations was sufficiently supported by evidence in the record.

### III

In *Draude I* this court held that the BZA (1) did not have sufficient evidence in the record to support its conclusions, (2) had failed to provide sufficiently detailed findings of fact and conclusions of law, and (3) had erroneously permitted GWU to aggregate FARs without a special exception. On remand the BZA cured these defects in its earlier performance. A review of the record shows that each decision is supported by sufficient evidence, and that the evidence adduced over the course of the various hearings rationally leads to conclusions of law consistent with governing statutes and regulations. The BZA's decision on remand is accordingly

*Affirmed.*